*30 Vroom.*                    Kohl v. State.

HENRY KOHL, PLAINTIFF IN ERROR, v. THE STATE,
                  DEFENDANT IN ERROR.

If, in a criminal case brought before this court, under the act of May 9th,
1894 (*Gen. Stat.*, p. 1154), the evidence is of such a nature that, when
fully and fairly examined, it will not satisfy a considerate mind,
beyond a reasonable doubt, of the guilt of the accused, a conviction
thereon must be set aside and a new trial granted.

On error.

For the plaintiff in error, *Thomas S. Henry* and *Chauncy
H. Beasley.*

For the defendant in error, *Elvin W. Crane,* prosecutor of
the pleas.

The opinion of the court was delivered by

DIXON, J.   The defendant, having been convicted, in the
Essex Oyer and Terminer, of murder of the first degree, per-
petrated by killing Joseph Preinel, has brought the entire
record of the proceedings upon the trial to this court, under
the act of May 9th, 1894.  *Gen. Stat.*, p. 1154.  According
to that statute, it is now our duty to determine "from the
record whether the defendant has suffered manifest wrong or
injury by rejection of testimony, or in the charge made to the
jury, or in the denial of any matter by the court which was
a matter of discretion, or upon the evidence adduced upon the
trial," and, if such wrong or injury appears, to order a new
trial.

After a careful investigation of the record, we find no fault
in it, except that the evidence does not justify the verdict.

To warrant a conviction of crime, the testimony should
prove the guilt of the accused beyond a reasonable doubt.  If
it fails to do this, *i. e.,* if it be of such a nature that, when
fully and fairly considered, it will not satisfy any thoughtful
mind, beyond reasonable doubt, of the guilt of the accused,

then a conviction does manifest wrong, according to our system of administering criminal law.

The jurors compose the appropriate tribunal for the determination of controverted questions of fact, but in a civil cause they cannot justly find a verdict for the plaintiff without evidence capable of leading a prudent person to believe in the plaintiff's claim, and in a criminal cause they cannot justly find a verdict for the state upon evidence which, viewed in any rational aspect, must leave reasonable doubt of guilt in every considerate mind. Against such verdict the party aggrieved can, by the common law, appeal to the trial court for a new trial, and under the statute above cited such an appeal can now be made in criminal causes to the appellate tribunal.

I proceed, therefore, to examine the evidence.

Joseph Preinel, an orphan, twenty-one years old, lived at No. 545 Eighteenth street, Newark, in the family of his uncle, the defendant's father. His occupation was selling newspapers and taking care of his uncle's cows. On June 14th, 1894 (Thursday), his uncle sailed for Europe, and on that day Preinel removed his trunk to the defendant's house in the same neighborhood, intending to sleep there but to continue boarding in his uncle's family. The defendant was twenty-two years old, a mason by trade, and lived with his wife and child.

On Friday, June 15th, Preinel, the defendant, and one Schweitzer, a witness for the state, were together drinking beer in a vacant lot, near the defendant's house, until about seven o'clock in the evening, when Preinel and the defendant went home, the latter saying that he was going to a masons' union that night. Shortly afterwards Preinel and the defendant sat down to tea in the house of defendant's father. The defendant left that house about half-past eight o'clock, and about twenty minutes later Preinel went out. About nine o'clock they were seen together near by, on the corner of Eighteenth street and Sixteenth avenue, where the defendant sent a boy to Kunzman's saloon for some whiskey, of which

Preinel took a drink. About ten o'clock the defendant was at the masons' meeting, 255 Court street, about half an hour's walk from Eighteenth street and Sixteenth avenue, where he drank some beer. The testimony is in some conflict as to the hour when he was there, but the witnesses agree that he was there just before the meeting organized, and the testimony of the secretary, who says it organized after ten o'clock, is the most trustworthy, because of his official position and because of the reasons which he gives for knowing it was late. This harmonizes also with the evidence as to the time of the defendant's presence elsewhere. About one o'clock on Saturday morning the defendant went into Blessing's bake shop, two doors from his own home, and bought some rolls, and, when asked why he was there so early, said he had been at his union and that he could not sleep, the mosquitoes were stinging him so much. From that time on his whereabouts are fully shown.

About eleven o'clock on Saturday morning Preinel's body was found by two young men in Shinder's creek, on the line of the Newark and New York railroad, about five miles from the defendant's house, towards New York. It lay in the creek, face downwards, with a large stone resting upon the back. The skull was broken, and a strap was drawn tight around the neck. Near by in the creek were four or five railroad coupling pins, which were fastened together and bore evidence of having been tied to the strap. There is no doubt he had been murdered, although it was at first regarded as a case of suicide, and as such the county physician's certificate, made on Sunday or Monday following, described it. News of the finding of the body was brought by the young men to the police station in Newark, at ten minutes past twelve o'clock noon, but the body was not identified as that of Preinel until fifteen minutes before seven o'clock on Sunday morning, when the defendant's mother saw it at the morgue.

Under these circumstances the burden resting on the state was to prove that, between ten o'clock on Friday night and one o'clock on Saturday morning, three hours of time, the

defendant had met Preinel, gone to Shinder's creek five miles away, murdered Preinel and disposed of his body in the manner indicated, and returned five miles to Blessing's bakery.

To support this burden, the state relied on two sorts of evidence—*first*, evidence that the strap round Preinel's neck had belonged to the defendant; *second*, evidence of the defendant's declarations.

Of the first sort it is enough to say that the evidence consists of the opinion of two witnesses that the strap is like one worn by the defendant.   Against this is the fact that the strap is a common one, and also the testimony of four or five witnesses, who had better means of observation than the others, that a very different strap, which was taken from the defendant's waist at the time of his arrest, was the one worn by him for some months before.   The preponderance of proof is decidedly against the state on this sign of guilt.

The other species of evidence needs more consideration.

After the defendant left Blessing's bakery, he went, about half-past two o'clock that morning, to Eckert's bake shop, about a block away, to help the bakers, Baukert and Schweitzer, as he had agreed the evening before to do.   They swear he told them that he had been at the masons' meeting; that a keg of beer had been set up there, and that he had not got home till two o'clock.   After they had made the dough, the defendant went out, saying he was going home, but would come back, and when he returned he told the bakers that his Cousin Joe had not come home and he did not know where he was.   The defendant stayed there about an hour making pretzels, and more than once spoke of his cousin not being home.   At the suggestion of one of them he went to see whether Preinel had not slept in the stable.   One of the bakers, Reuple, a lad then sixteen years old, swears that about five o'clock he asked the defendant why he had not gone fishing that morning with Mr. Eckert as he had promised, and the defendant replied that he was out, down in the creek with Joe Preinel, and that Joe was killed.   In giving this conver-

sation a second time, the witness said that defendant told him Joe's body was down in the creek, and that Joe was killed, and to this form of expression he adhered.

In the remark sworn to by Baukert and Schweitzer there is no reference to Preinel's death, and its whole force lies in the fact that on the preceding night a keg of beer had not been set up at the masons' meeting, and so, if the witnesses are right as to the date, the defendant gave a false account of his whereabouts during the critical hours.

But it appears that the defendant was at large until July 9th, when he was arrested on his wife's complaint for assault and battery, and that he was not charged with this murder till near August 1st; that in the latter part of June or early in July a keg of beer had been set up at the masons' meeting, which was regularly held over a beer saloon, and that the defendant frequently worked in the bake shop with these witnesses early in the morning. It is, therefore, easy to believe that the remark was made on some other morning, the witnesses being mistaken only as to the date. With a conversation so indifferent at the time and not recalled for weeks afterward, such a mistake is not only possible but highly probable.

The words sworn to by Reuple are more significant, but in the form in which they were persistently given by him the time of their utterance is all important. For the defendant to say on Saturday morning that Joe's body was in the creek and he had been killed, would be clear evidence of his guilt, because no one except the murderer then knew that; for him to say the same thing on Sunday morning would be no sign of guilt whatever, because then many innocent persons knew it. We must, therefore, consider carefully whether the witness is trustworthy as to time. He says this remark was made to him about half an hour before the defendant spoke of Joe's not being home, and that it was made about five o'clock. The other bakers say he spoke about Joe's not being home about three o'clock. The remark sworn to by Reuple, if made on Saturday, was a startling one, and inconsistent

with the defendant's declarations, made soon after in Reuple's hearing, that he did not know where Joe was. But it seems not to have startled the witness, and he did not call attention to the inconsistency. The witness explains this by saying the defendant asked him not to tell anybody, but this explanation is inadequate and perhaps even adds to the surprise at his concealing so shocking a fact. The witness did not speak of this remark until four weeks afterwards, when he related it to a detective, to whom he subsequently repeated it about five times. On the following morning (Sunday) Baukert, Schweitzer, Reuple and the defendant were in the same shop at work, and Reuple says the defendant then told Baukert that Joe was found in the creek and that he was killed. It thus appears that the surroundings of the witness on these successive mornings were very similar, and it is not unlikely that, when called on by the detective for evidences of the defendant's guilt, he transformed an innocent utterance into an indication of criminality by a mere confusion of the two occasions.

The witness Schrade swears that on Saturday before dinner in Kunzman's saloon, where they drank beer, the defendant told him that he had heard his cousin was drowned, but he would not believe it until he saw him. The witness could not say whether this was ten, eleven or twelve o'clock. He lived over the saloon, and the defendant was frequently in it. This testimony likewise is open to the criticism that there was nothing to render the witness certain as to time, and a slight error in that particular would strip the remark of all importance, for a report that a body had been found drowned might reach the defendant soon after noon, and that, coupled with Preinel's disappearance, might awaken the fear which the words expressed.

A young woman testifies as follows: "On Sunday afternoon, June 17th, the defendant asked me if I had heard of his cousin's death, and I said no; and he says, 'He committed suicide;' then he says to me, 'I went fishing with him;' I don't remember did he say Thursday night or Friday night, 'I

went fishing with him down to the fishing banks, down in the bay or banks;' I don't know did he say banks or bay; and he says, 'All of a sudden he was gone;' and he says he thinks he committed suicide."

This witness swore she did not pay much attention to what the defendant was saying, and did not speak of the conversation until July 8th, when she told it to the detective.

This testimony, if fully credited, is of grave import, which does not depend upon its accuracy as to time. Collocated as the witness gives them, the defendant's words amounted to a declaration that he had been fishing with Preinel, when Preinel suddenly disappeared and committed suicide. But it is noticeable that, according to the narrative, the defendant named the night Thursday or Friday when he went fishing with Preinel, and did not in terms connect that night with the disappearance and suicide of Preinel. If, in fact, the defendant referred to different occasions, which have been represented as one through the inattention of his hearer, the testimony loses much of its force.

This was the case made by the state. It consisted substantially of the defendant's declarations, which, as repeated by the witnesses, were of such a character that a slight change in the phraseology or in the time of their utterance deprives them of much significance on this charge. When we reflect upon the inherent difficulty, even under most favorable conditions, in remembering with precision the words of a conversation and the time of its occurrence, and observe that the declarations now under review were made to persons who attached no importance to them at the time, and did not attempt to recollect them until weeks afterwards, and then, for the purpose of aiding in the detection of a murderer, the frailty of the case becomes apparent.

If now we turn, not to the testimony offered by the defendant, which in many points contradicted the evidence already reviewed, but to the negative signs of innocence disclosed in the state's proof, I think it certain that reasonable doubt of the defendant's guilt must arise in every thoughtful mind.

The defendant and Preinel were friends, and there was no motive, peculiar to the defendant, for the murder. It is suggested in the evidence that Preinel had several hundred dollars on his person, and that robbery was the motive for the crime. But, although the defendant was poor, working for his daily bread, and was at large, frequenting his familiar haunts, unsuspected, for several weeks after the crime, he does not appear to have had any more money than usual or in any respect to have changed his habits.

The locality where the murder was committed was muddy, and the murderer must have walked into the creek to place the body in the water and put the large stone upon it. If the defendant was the murderer, he must have used extreme haste to do all that he did in the three hours during which the state's witnesses did not show his whereabouts. Yet, at the end of those three hours, in Blessing's bakery, it was not noticed that he was wet or muddy, or that he wore any other than his usual clothes, and he exhibited no signs of perturbation, but spoke in an ordinary way of the masons' meeting and of the mosquitoes.

In fine, our conclusion is that, while the state's evidence raises suspicion against the defendant, it so clearly fails to prove his guilt beyond a reasonable doubt that we are constrained to adjudge that he has, in the language of the statute, suffered manifest wrong upon the evidence adduced upon the trial, and therefore to set aside the conviction and order a new trial.

VAN SYCKEL, J. (concurring). Henry Kohl was convicted, in the Essex County Oyer and Terminer, of the murder of Joseph Preinel. The evidence was purely circumstantial.

There was a general exception to the charge of the court to the jury, which exception was allowed by the trial court.

The motive imputed by the state to the defendant, on the trial, was that he murdered Preinel to secure possession of money which it was alleged he had upon his person. In my

review of the case, I deem it necessary to call attention to that evidence only which relates to that subject.

Martha Block, a witness produced on the part of the state, in her examination-in-chief, testified that she said to the defendant "that it was funny that Preinel's gold watch was taken and his money, if he committed suicide, and he said it was not a gold watch, it was a silver watch."

On cross-examination of this witness, the defendant's counsel very properly asked her the following questions:

"*Q*. You spoke about him having money; did you ever see Preinel with any?

"*A*. No.

"*Q*. How do you know he had any money?

"*A*. Henry's mother told me."

And afterwards the witness said that the defendant's mother told her that he had $400 or $500.

When the defendant's counsel asked the witness how she knew Preinel had money, he had no reason to think that she would give an answer not responsive to the question. The answer was clearly incompetent, and it should have been stricken out if defendant's counsel had requested it to be done. No such motion was made, but the answer showed that the witness had no knowledge whatever that Preinel had any money in his possession or on his person. Her knowledge was mere hearsay and entitled to no consideration whatever.

The next allusion to this subject is in the testimony of George Brueckner, a witness sworn on behalf of the state.

The prosecuting attorney asked this witness why he cut the clothes off the murdered man, and, after replying that they were saturated so that he couldn't get them off, he was asked:

"*Q*. What was the other reason?

"*A*. The other reason was Mrs. Kohl said he had $800 on his body."

The court said : " That is scarcely competent evidence."

The defendant's counsel said : " I don't think it is competent, your honor."

The court said : " It is not.  It may become so during the trial of the case, but as it is now it is not competent evidence."

After the state had rested its case, Elizabeth Kohl, the mother of the defendant, was sworn as a witness on his behalf.

On her examination-in-chief she was asked this question :

"*Q.* At any time since the time Joe came there did he show any large sums of money ?

"*A.* No, never."

That was all she testified to in her examination-in-chief on this subject.

On her cross-examination by the prosecuting attorney the following questions and answers appear in the state of the case :

"*Q.* You finally searched the trunk, didn't you ?

"*A.* Yes, Mr. Brueckner said I should examine the trunk.

"*Q.* What did you examine the trunk for ?

"*A.* Because it was said that the boy had money.

"*Q.* Who told you so ?

"*A.* Plenty of people.

"*Q.* Lots of people told you so ?

"*A.* Yes.

"*Q.* Didn't you know that he didn't have any ?

"*A.* Joe had no money only what he received from us.

"*Q.* A dollar on each Sunday ?

"*A.* Father gave him a dollar on every Sunday.

" By the court—Do you say that everybody thought he had money ?

"*A.* Yes, everybody said he had money ; he had his property in his pocket."

It is manifest that all this cross-examination, including the question by the court, was incompetent and illegal.

On her examination-in-chief the witness was not asked whether Preinel had any money; all she was interrogated about and all she said was that he never showed any large sums of money. It was, therefore, no contradiction of her testimony that other people said he had money.

It was the merest hearsay and of no evidential value whatever against the defendant, but yet so prejudicial to the defendant's case that I cannot conceive why the defendant's counsel did not object to it and have it overruled, unless he was misled by the question asked by the court, and therefore assumed that in the opinion of the court the case was in a situation which made it competent, as the court had said, during the examination of Brueckner before referred to, that it might become competent during the trial.

All this evidence of Mrs. Kohl as to what people said was hearsay, and could not lawfully have any weight against the defendant, nor was it competent to impeach her in respect to anything she had sworn to on her examination-in-chief. The only competent testimony given by her in this regard, on her cross-examination, was her statement that Preinel had no money except the small amount he had received from her husband. This was not a cross-examination, it was new matter about which the witness had not been questioned in chief, and therefore it became the testimony of the state, and the witness to that extent was the witness of the state. The state had no right to impeach her by showing that she had made statements, before she was sworn, inconsistent with that testimony. Other witnesses could have been called by the state to show that Preinel had money, but testimony to impeach her in respect to ·the statement made by her on cross-examination, in reference to a matter not alluded to in her direct examination, was incompetent.

After the defendant's case was rested, the state called George Brueckner and asked the following questions:

"*Q.* I asked if she [Mrs. Kohl], upon her first visit to your place on Sunday morning, did not tell you that she

thought this boy was murdered, and that he had $800 upon him?

"*A.* That is what she said on the first visit.

"*Q.* Just tell us about that?

The court said : " Just tell all the conversation."

The witness then stated that " Mrs. Kohl told him that Preinel had $800 on his body."

The entire record is brought into this court by the writ of error, and by the act of May 9th, 1894, it is provided that if it appear from such record that the plaintiff in error on the trial below suffered manifest wrong or injury, whether by rejection of testimony, or in the charge made to the jury, or in the denial of any matter by such court, which was a matter of discretion, or upon the evidence adduced upon the trial, the appellate court shall remedy such wrong or injury, and give judgment accordingly and order a new trial.

The evidence of George Brueckner was clearly incompetent. It was inconsistent with nothing which Mrs. Kohl had testified to, so far as she can be regarded as a witness for the defence.

The defendant's counsel had objected to this testimony when it was previously offered by the state, and I think, under a humane administration of the criminal law, in a case involving the life of the defendant, it should be considered that the objection previously made was still interposed to this evidence, and that the objection would have been repeated if the court had not instructed the witness to tell this story.

The evidence was incompetent and must have been highly injurious to the defendant, and he was thereby manifestly wronged by the evidence so adduced.

But if this view of the case is not taken, in my judgment there is an error in the charge of the court to the jury, whereby the defendant suffered manifest injury.

In alluding to the alleged motive of the defendant in killing Preinel, the court charged the jury as follows :

" The prosecutor contends that, in the evidence, a motive appears in this case which induced the prisoner to kill the deceased. On the other hand, the prisoner's counsel earnestly contended that there is a total absence of such motive. I leave the discussion by counsel on that head to your consideration."

Assuming that all the testimony which has been recited was competent, there is not a word in it which justified the jury in finding any motive to commit the crime, or which justified the court in leaving it to the jury to find that Preinel had money on his person. The evidence of Martha Block was admitted to be founded on hearsay only. The testimony of Mrs. Kohl was that Preinel had no money, and the evidence introduced to contradict her, by her own cross-examination and by the testimony of Brueckner, was not substantive evidence to show that Preinel had money. No such inference or conclusion could lawfully be based upon that evidence. That evidence simply rendered less credible her sworn statement that Preinel had no money. Therefore, when the court told the jury that the question of motive was left to their consideration on this evidence, it was an instruction, in substance, that the jury might find that Preinel had a considerable sum of money, and that declarations not under oath, competent only for the purpose of impeaching the sworn testimony of Mrs. Kohl to the contrary, could be accepted by the jury as proof of a most damaging fact against the prisoner.

The court should have instructed the jury, as the law unquestionably is, that this evidence offered to contradict Mrs. Kohl had no probative force whatever to establish the fact that Preinel had money, and thereby show that a motive existed to commit the crime.

For the reason that the jury was permitted by the charge of the court to regard this hearsay evidence as proof of a controlling fact in the case to the manifest injury of the prisoner, and for that reason alone, the judgment, in my opinion, should be reversed and a new trial granted.

THE CHANCELLOR (dissenting). In virtue of the one hundred and sixty-third chapter of the laws of 1894 (*Pamph. L., p.* 246 ; *Gen. Stat., p.* 1154, § 170) this cause is reviewed upon the evidence adduced and all the proceedings which were had at the trial in the Essex Oyer and Terminer.

The statute referred to provides " that the entire record of the proceedings had upon the trial  *  *  *  may be returned  *  *  *  with the writ of error, and when returned shall form a part thereof, and on the argument such entire record shall be considered and adjudged by the appellate court; and if it appears from such record that the plaintiff in error on the trial below suffered *manifest wrong and injury,* whether (*a*) by rejection of testimony, or (*b*) in the charge made to the jury, or (*c*) in the denial of any matter by such court, which was a matter of discretion, or (*d*) upon the evidence adduced upon the trial, the appellate court shall remedy such wrong or injury and give judgment accordingly and order a new trial."

It was not the legislative purpose that this court, in its review of the proofs, should order a new trial merely because, after reading a printed case, it thinks that it would, through reasonable doubt or otherwise, have reached a different conclusion from that which the jury reached, if it had been in the jury-box. The effect of such an interpretation of the legislative meaning would, in all criminal cases, be to render nugatory a conviction by jury and substitute for it the review of this court. And it appears to me to be but a specious paraphrase of this objectionable interpretation to hold that this court may inquire whether reasonable men, as such men may be fashioned in the minds and according to the standards of the several members of this court, should not have entertained reasonable doubt in the given case.

The legislation is directed to the review of the case by an appellate tribunal to see if there be wrong or injury in the action of the court of first impression, and not to the hearing of the case *de novo.* The legislative emphasis is upon the requirement that the wrong and injury, to warrant the court's

interference, shall be " manifest." It must be demonstrated. In its review of the case this court is not to inquire whether it affirmatively appears that the conviction is proper beyond its reasonable doubt, but, proceeding upon the assumption that the conviction is right, its inquiry must be whether adherence to that assumption is demonstrated to be unjust. It is the province of the jury to see the witnesses and, observing their appearance, demeanor and intelligence in testifying in addition to their words, judge of their credibility. Then, having settled that important preliminary, if there be conflict in the evidence or if different inferences may be drawn from it, they are to weigh the whole evidence and determine the facts. It is not the legislative purpose that these functions of the jury shall be overridden in a review which is to be had upon that part of the case only which a paper-book presents. The statute considered does not contemplate that the im- portant assistant in determining the credibility of witnesses— the observation of their characteristics, their demeanor on the witness-stand, apparent candor and intelligence in testifying, which aided the jury—is to be eliminated from the case, and that upon the remnant the case is to be determined *de novo.* The statute means what it plainly says, that it must be " manifest " that it clearly appears that the conviction is wrong, either because it is against the clear weight of evi- dence or because it has been influenced in some way by passion, prejudice, mistake, perversion or corruption. Judge Andrews, in writing for the New York Court of Appeals, in *People* v. *Cignarale,* 110 *N. Y.* 23, as to the meaning of a similar statute, said : " It is a cardinal principle in our juris- prudence that the jury is the ultimate tribunal for the inves- tigation and determination of questions of fact. It is no more the province of the appellate court than of the court of original instance to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate function of the jury, and neither can substi- tute its own judgment for that of the jury where the facts are reasonably capable of diverse and opposing inferences."

The present case turns upon the credibility of witnesses.

The proofs show that Joseph Preinel was murdered on the night of Friday, the 15th of June; that his body was found in Shinder's creek, some five miles from the residence of the plaintiff in error, Kohl, at half-past eleven on Saturday morning, the 16th of June, and that until Sunday morning, the 17th of June, after five o'clock, it was unidentified and supposed to be the body of a suicide.

A witness named Eckert testified that on the previous Thursday, the 14th of June, Kohl arranged to take him fishing in the morning of Saturday, the 16th of June, at two o'clock.

A young man named Reuple, who worked in Eckert's bakery, testified that on that Saturday morning, between two and three o'clock, Kohl wakened him from sleep and they went together into the bakery where there were others and went to work making pretzels; that about five o'clock, while they were yet at work, he asked Kohl why he (Kohl) had not gone fishing with Eckert, and Kohl replied that he had been down by the creek with Preinel and that Preinel had been killed.    The witness also states that a little later on the same morning he overheard Kohl tell another man that Preinel had not been at home all night and that he was going to look for him.

If Reuple speaks honestly and correctly understood Kohl, his testimony, considered in the light of all the proofs, is strongly criminatory, for Kohl's statement was not only an admission of his having been at the place of the murder, but also betrayed a knowledge of Preinel's death hours before the body was found.

Besides this testimony, a young woman, Carrie Bentz, testified that on Sunday afternoon, after the identification of the body, she met Kohl and that as she conversed with him about Preinel he said : " I went fishing with him down in Shinder's creek, down in the bay or banks, and all of a sudden he was gone," and added that he thought that Preinel had committed suicide.

If this witness correctly understood and speaks honestly, there was a second acknowledgment by Kohl of his presence at the place of the murder, and, in this instance, also at the time of the murder.

Another witness, named Schrade, testified that, on Saturday morning, between ten o'clock and noon, before any knowledge of the finding of the body had reached them in a saloon, Kohl told him that he had heard that his cousin, Preinel, had been drowned, but that he would not believe it until he should see him.

It is argued against credence of these witnesses that time elapsed between the death of Preinel and the arrest of Kohl, when their attention was first directed to the importance of the remarks testified to, and that within that time much may have been said, so that conversations and dates may have become confused in their minds.

Are we justified in making such an assumption? The witnesses speak with positiveness. They appear to be free from all bias. The jury were alert upon this very suggestion, and after probing the case for days and seeing and hearing the witnesses, and intently considering those indescribable qualities which appear only through the senses of sight and hearing, believed them. This court does not disbelieve them. Its attitude, as I understand the majority, is that, upon review by paper-book, which affords only part of the facilities the jury had, they think that the jury should, as reasonable men, have doubted. The correctness of this conclusion is not manifest. Nor do I think it is made so by the suggestion that there is no adequate proof of motive for the crime, and no evidence that the clothing of Kohl betrayed, by mud or water, that he had been in Shinder's creek, as he must have been to have covered the murdered man with the stone found upon him. The case is not without proof of motive. It will not serve any beneficial purpose to here at length detail the evidences upon that point. It is sufficient to say that, at the very time of the murder, Kohl's father had gone to Germany to look after some inheritance of Preinel, and that it was the

current belief, sufficient probably to satisfy one of Kohl's intelligence and condition, that the latter had money in his possession. From these conditions, the poverty and general character of Kohl and minor circumstances, the prosecution claim an inference as to motive, which I think the jury might fairly have drawn. It certainly would have strengthened the proof of Kohl's guilt if he had appeared at Eckert's bakery, on the night of the murder, wet and muddy, but it is not unnatural that he would try to avoid such manifestations of guilt, and it is not difficult to conceive how he may have succeeded in doing so.

It is not clear that the defendant has suffered wrong and injury from the conviction.

*For affirmance*—THE CHANCELLOR, GUMMERE, MAGIE. 3.

*For reversal*—DIXON, LIPPINCOTT, VAN SYCKEL, BARKALOW, BOGERT, DAYTON, HENDRICKSON, KRUEGER, NIXON. 9.