FRANK F. NELSON, PLAINTIFF-RESPONDENT, v. EASTERN. AIR LINES, INC., A CORPORATION, C. NORMAN SCULLY AND FRANCIS JOHNSON, JR., DEFENDANTS, AND WILLIAM POLISTINA, WALTER BAILEY AND HENRY MORGANROTH, DEFENDANTS-APPELLANTS.

Submitted October 31, 1941—Decided January 29, 1942.

For Frank F. Nelson, *Patrick J. Maloney* and *Haines & Chanalis.*

For Eastern Air Lines, Inc., and C. Norman Scully, *Gerald M. F. McLaughlin* and *Fred A. Lorentz.*

For William Polistina, Walter Bailey and Henry Morganroth, *Coult, Satz, Tomlinson & Morse (Joseph Coult).*

The opinion of the court was delivered by

CASE, J. Nelson was employed as stock clerk and Scully as field manager by Eastern Air Lines, Inc., at Port Newark. There had been thefts on the property and Nelson was suspected. Nelson was "picked up," detained, examined and, according to his complaint, subjected to false arrest, assault and battery and slanderous accusation. Polistina, Bailey, Johnson and Morganroth were all members of the Newark police department. Judgment went for Nelson in the amount of $600 against Polistina on the false imprisonment count and in the amount of $6,600 against Polistina, Bailey and Morganroth on the assault and battery charge. Plaintiff was nonsuited as to the slander count. Defendants Polistina, Bailey and Morganroth appeal from the judgments against them, and Nelson appeals from the judgment of nonsuit.

There was testimony upon which it could be found that: On the morning of October 6th, 1938, Polistina, accompanied by Scully, went to Nelson's apartment, caused him to be awakened, told him to get out of bed and get dressed and said, "You and Hard [a roommate and fellow employee] are going across the street for a little cup of coffee with us." The four then went to a "diner," nearby, where an Air Lines Company check with a forged endorsement had been cashed. The counter man viewed both of the young men and said to Polistina, "No, neither of these boys." Nelson was called upon to give, and gave, specimens of his handwriting. Nelson and Hard were then taken to the Newark police headquarters, and Nelson was conducted by Polistina to a small room opening upon a large one. Polistina obtained, at his direction, numerous further specimens of Nelson's handwriting and absented himself for about two hours. He then returned, told Nelson that the handwriting had been submitted to a prominent expert and pronounced identical with the writing in the forged endorsement and that another employee at the diner had positively identified him as the one who had presented the forged check there. Polistina then called upon Nelson for a confession—"You may as well do it right now, to-day, because you are going to get a good beating. * * * You will be lucky if you leave here without any fractured ribs * * *," whereupon, with a foul epithet, he struck Nelson across the face, kicked him in the stomach and closed the door, leaving Nelson in the small room alone. Presently Scully came in, urged Nelson to confess and left. Bailey and Johnson then came, closed the door, threatened Nelson with a beating unless he confessed and cursed him. Bailey hit Nelson in the face and Johnson lashed him with a piece of rubber hose 18 to 20 inches in length until Nelson was on the floor. There was a short cessation followed by further profanity and lashing, and the two officers left Nelson alone for a brief period. Then Polistina, Bailey, Johnson and a fourth officer came in and after a time left with the exception of Johnson who, with a hose in each hand, flayed Nelson until he had beaten him, cowering and crying, to the floor. There was a further interval fol-

lowed by the entrance of Johnson, Morganroth and another, who indulged in further accusations, name-calling and physical punishment. Nelson was told that he could save himself from further beatings and confinement if he would confess: that if he confessed all that would happen would be that he would lose his job and have to make restitution, but that if he refused to confess permission would be given an officer to bring him down at midnight, stretch him across a table and go at him again with a rubber hose. Nelson was then fingerprinted and otherwise identified, put in a cell and imprisoned there without further maltreatment until Saturday morning, the second day after his incarceration, when he was released and told to appear the following Tuesday for a "line-up." Thereafter he received medical attention and at the time of the trial, a year and a half later, was still wearing an abdominal belt as the result of the physical violence inflicted upon him by the defendant policemen.

That was Nelson's story. Parts of it were strongly assailed. The police denied *in toto* the charges of abuse and assault. But the jury was entitled to believe Nelson and apparently did believe much of what he said. The recital, in its essential features, was not without credible support. There was both medical and lay testimony regarding Nelson's condition immediately after the experience at the police station; Nelson showed subjective symptoms of pain and physical incapacity and, objectively, numerous black and blue marks over his body. There were no warrant for arrest, no commitment and no arraignment before a judicial officer. Neither then nor later was there a complaint or an indictment against, or a conviction of, Nelson concerning the alleged crimes. Defendants denied that Nelson was unwillingly deprived of his liberty or that a violent hand was laid upon him; on the contrary they insisted that he willingly submitted to the proceedings as a contribution toward clearing up the mystery of the larcenies. Later, on December 31st, 1938, one Stevenson, an employee of the Air Lines and a roommate of Nelson and Hard, made a signed confession and shortly thereafter committed suicide. A limited use of Stevenson's confession was permitted at the trial in the effort to impugn the credibility of Nelson whom the confession was said to implicate.

The appellant police officers first complain of the following portion of the judge's charge:

"Assuming in this case that the original arrest of this plaintiff by the officer Polistina without a warrant was legal on the theory that the police officer had grounds to reasonably suspect that a common law felony, such as larceny, had been committed, the detention of the plaintiff Nelson by the police officer was justified only for the length of time reasonably required to take the plaintiff before a magistrate and procure a warrant of arrest. * * * If the detention or constraint of the person of Nelson, the plaintiff, was unreasonably prolonged, that is for a greater length of time than would be reasonably required to take the plaintiff before a magistrate and procure a warrant in the circumstances, the detention of the plaintiff became unlawful from the very beginning even though the original apprehension of the plaintiff might have been justified as lawful; * * *. A police officer arresting without a warrant cannot justify himself in holding the prisoner for an unreasonable time before obtaining a warrant upon the ground that such delay was necessary in order to investigate the case. It is the duty and the obligation of the police officer to bring the arrested person to a magistrate or before a court of competent jurisdiction as quickly as the circumstances of the case will permit."

It is well in reviewing the charge to have in mind the state of the proofs to which the charge was to be applied. More than forty-eight hours elapsed from the time when Nelson was confronted, while still in bed, by Officer Polistina to his release on "parole," as it is called, on the second day thereafter. During part of that time he was being manhandled; during much of it he was kept, alone, in a cell. If the defendants' contention that that was a voluntary experience is true, then there was no arrest. But the willingness or the compulsion was a strongly litigated issue, even as to the detention; and the idea of willingly taking a beating is absurd. Nelson testified that he was apprehended and held against his will. The practical question under so much of the testimony as portrayed an enforced detention was whether, under the circumstances of the case, the jailing of Nelson for two

days and two nights in the City of Newark was reasonably necessary to afford the police an opportunity to secure appropriate process. Appellants contend that under *Pine* v. *Okzewski*, 112 *N. J. L.* 429, and *Jackson* v. *Miller*, 84 *Id.* 189, the officers had the authority to make that forcible detention in that it was reasonably necessary to give opportunity for investigation. We find no support in those cases for an argument applicable to the character or length of confinement here imposed. The general rule is stated, and we think correctly, in the Jackson case as follows:

"A person who has been arrested without a warrant cannot lawfully be held in custody for any longer period than is reasonably necessary to obtain a legal warrant for his detention. Where he is held for a longer period without such writ or other authority from a competent court, he has a right of action for false imprisonment against the officer or person who made the arrest, and those by whom he has been so unlawfully held in custody."

In the Pine case it was claimed by the plaintiff—automobilists from the State of Oklahoma—that there was false imprisonment in a detention of two hours while the police authorities were ascertaining the provisions of the Oklahoma motor vehicle statute regarding the issuing of licenses in order to determine whether the failure of the plaintiffs to produce motor vehicle and driver's licenses was a violation of the New Jersey law. The denial of that contention holds no support for appellants' argument as applied to the facts of the instant case. Among the cases cited and approved in the Pine opinion is the earlier decision of this court in *Hebrew* v. *Pulis*, 73 *N. J. L.* 621, wherein it was said:

"The essential thing is the constraint of the person. This constraint may be caused by threats as well as by actual force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. Unless it is clear that there is no reasonable apprehension of force, it is a question for the jury whether the submission was a voluntary act, or brought about by fear

that force would be used. * * * But even if the case had been such that the officer would have been justified in arresting without a warrant, we think he was not justified in compelling the plaintiff to strip naked. Whether he would have been justified in carrying a search of the person to that point if he had had a warrant is a question not presented. The fact that the officer went to this length might suffice to render him a trespasser *ab initio*. The other defendants stood by and apparently assented to his conduct and took part in the search. They are therefore liable to the same extent as he."

For an analogy in the reasoning we may substitute the acts of physical violence in the place of the stripping referred to in the cited decision. In *Francisco* v. *State,* 24 *N. J. L.* 30, wherein a constable with warrant authority to arrest a man and take him before a magistrate in Passaic County arrested the man in Passaic County and then carried him over to Essex it was held that "The moment he (viz., the constable) exceeded his authority he made himself a wrongdoer, *ab initio,* and liable to a criminal, as well as a civil prosecution; for an illegal interference with the liberty of the citizen is an offense against the state."

Appellants further complain that the court's charge on the alleged assaults did not recite all of the exceptions to the rule that an officer may not use violence upon a prisoner. It is enough to say that the charge omitted no exception that was a material factor in the case.

It is next said that the trial court erred in permitting the jury to find against the defendants Polistina, Bailey and Morganroth and in favor of the defendant Scully. The argument is that inasmuch as the complaint alleges that Scully, acting for the Air Lines, caused the remaining defendants to commit the torts charged against them, Polistina could not be guilty of the tort alleged in the first count or Polistina and his associate appellants of the torts alleged in the second count unless Scully was guilty of the charges laid against him. The questions arise on refusals to charge. The relationship between the Air Lines and Scully, one or both, on the one hand and the police officers on the other was not either in fact or, in our opinion, according to the allegations

of the complaint that of master and servant or of principal and agent. Each of the police officers pleaded, as a defense, that "all acts and things done by him were performed in the exercise of authority vested in him and required of him as a police officer of the City of Newark, New Jersey." Scully testified that he simply reported the thefts to the police and that his presence with Polistina was at the latter's request. We find no substantial contradiction of that assertion from the remaining defendants. Polistina testified that after showing the handwriting to Morganroth and Bailey he was convinced that the handwriting of Nelson was similar to that in the forged endorsement; questioned as to why he had locked Nelson in a cell, he said "Because I was satisfied that he had forged the check. It was my opinion he had forged that check;" asked further why he did not swear out a warrant for Nelson's arrest, he replied, "Well, no particular reason." The testimony fully supports the judicial action. The only substantial question is whether the issues framed by the pleadings permitted that course; and while we do not commend the manner of drafting the complaint we think that the trial moved upon the theory that the participants were defending themselves against a charge of concerted action. If the testimony of Nelson was true—and that was a jury question—there was ample justification for finding that Polistina was the person who caused and made the arrest and that all of the appellant police officers acted in concert to force Nelson to a confession by physically and mentally beating down his will and his power to resist. Appellants under the respective counts were fully aware that they were being sued for restraint and violence charged to have been exercised by them against Nelson's body. There is nothing inconsistent in the finding that they committed the alleged torts and that neither Scully nor the Air Lines participated in the wrongful acts or caused appellants to do so. In *Vaniewsky* v. *Demarest Brothers Co.*, 106 *N. J. L.* 34, cited by appellants, the master was sued because of the alleged negligence of his employee, a co-defendant, in driving the master's automobile; the employee was exonerated but the master was subjected to a judgment for damages in the trial court with reversal on appeal. There is

a quite obvious and logical distinction between a verdict against A and in favor of B where the two are sued jointly on the tortious conduct of B and an acquittal of A with a verdict against B in like circumstance. We conclude that the point does not demonstrate error.

There is, we find, no merit in the contention that the court failed to distinguish between the respective liabilities under the first and second counts of the complaint and thus confused the jury. It follows from the discussion, *supra,* that the jury was free, upon a finding that the defendants under the second count acted in concert with the purpose of accomplishing a common objective, to lay against them a joint and several liability "for the damages which would justly compensate for the wrongs which were committed upon Nelson for the injury to his person." The subject of the discussion was compensatory damages. The words "injury to his person" were clearly used by the court as meaning "physical" or "bodily" injury. The jury verdict sharply distinguished between the first and second counts and between compensatory and punitive damages. The verdict went against Polistina alone for $600 under the first count and against all of the appealing defendants for $600 compensatory and $6,000 punitive damages under the second count.

Finally, it is said that the court erred in refusing to make absolute appellants' rule to show cause why a new trial should not be granted upon the ground that the verdicts were excessive. The argument is that the proper rule to be applied in assessing punitive damages against joint tort feasors differs from the rule applied by the trial judge in the disposition of the appellants'.rule to show cause. The utter weakness of the point is apparent. The trial court's refusal to set aside, as excessive, a verdict of $6,000 punitive damages for the indignities and suffering which the jury, under the evidence, could find was tortiously inflicted by the appealing defendants upon the plaintiff was clearly not so far from the proper realm of discretion as to be termed an abuse. If the defendants, or any of them, had conceived that there was a rule of law which should control the jury in the process of finding and admeas-

uring damages, it was for them to have requested the judge to include a statement thereof in his charge. Such a request made and refused, or on the other hand made and allowed, in error, would have been ground of appeal; but the persistence with which fruitless efforts are made to review, on appeal, the disposition by the trial court of rules to show cause why new trials should not be granted leads us to try again, as we have often tried before, to make clear our view of the law on that subject.

The position that error will not lie in a matter resting in discretion was recognized and held in our very early cases. *Wright* v. *Green,* 11 *N. J. L.* 334. In 1850 the Supreme Court held in a case removed to it by writ of error from the Common Pleas, *Furman* v. *Applegate,* 23 *N. J. L.* 28 (italics inserted) :

"The next and last error assigned is, that the Court of Common Pleas refused to award a new trial on the alleged ground, that the verdict of the jury was contrary to the evidence and contrary to law, and was in divers other respects erroneous and unlawful; and *because the damages awarded by the jury were excessive,* and wholly unwarranted by the evidence. This pretended error is most certainly unsupported. *An application for setting aside a verdict, and awarding a new trial, is always addressed to the judicial discretion of a court, and error cannot be urged against such exercise of that discretion.* It is true that the judges have sealed a bill prepared upon that exception; but it not being a proper matter for a bill, it cannot be examined into by this court on writ of error."

Thirty years later Chief Justice Beasley, writing the opinion for this court in *Delaware, Lackawanna and Western Railroad Co.* v. *Nevelle,* 51 *N. J. L.* 332, said :

"The question, and everything, either of law or of fact, embraced in the question whether a new trial shall be granted, has ever been deemed a subject addressing itself to the discretion of the court, and on that account the judicial action in that sphere has never been subjected to the least superintendency * * *."

A few years later Mr. Justice Van Syckel, also expressing the opinion for this court, in *Central Railroad Co.* v. *Tunison,* 55 *N. J. L.* 561, said:

"The Circuit Courts are constitutional courts, * * *. These courts have always exercised, as an important branch of their jurisdiction, the right to decide finally and without review whether a new trial shall be granted, and that right cannot be taken from them without substantially and materially impairing their powers. * * * Its right to dispose finally of a rule to show cause why a new trial should not be granted, * * * has always existed and been recognized since its formation, and is beyond the reach of hostile legislation."—Reasoning which applies equally to the Supreme Court. So, too, Mr. Justice Minturn in *DeMateo* v. *Perano,* 80 *N. J. L.* 437, "* * * the refusal to grant a new trial is a matter resting entirely in the discretion of the trial court, and is not the subject of review on error;" and Mr. Justice Trenchard in *Heinz* v. *Delaware, Lackawanna and Western Railroad Co.,* 90 *Id.* 198, "* * * the refusal to grant a new trial is within the power of the court and is no ground for appeal." In *Pariser* v. *Pasteelnick,* 95 *Id.* 260, the principle was taken to be so thoroughly established that it was restated in a mere *per curiam* opinion. This review of cases is not intended to be exhaustive, but it is sufficient, we think, to show the unanimity of unqualified and high judicial expression over a long period of time; and we consider, and have constantly considered, that the general rule, subject only to the modification we shall presently mention, still endures.

In *Gaffney* v. *Illingsworth,* 90 *N. J. L.* 490, it was suggested that if the trial court, in granting a new trial because of inadequate damages, *imposed terms* which appeared to be an abuse of discretion, an appellate court would have power to vacate such *terms* upon that ground. But the appellate court did not undertake to exercise the power either in that case or in *Robinson* v. *Payne,* 99 *Id.* 135 (rested upon the Gaffney case) where comparable language was used; and it is pertinent to observe that both of those suits involved the delicate judicial act, under recent statutory authority, of severing the determination of the amount of damages from the determina-

tion of the fact of liability, sound enough in theory but susceptible of grave injustice in practice and actually not either a granting or a denial of a complete new trial. See *Degenring* v. *Kimble*, 115 *Id.* 379:

"It is quite clear, however, that the large discretion granted to a trial court in imposing terms should be most carefully and cautiously exercised, particularly in cases of limitation to damages only and in favor of a plaintiff claiming that they are inadequate. The proof of liability should be exceptionally clear in order to justify the restriction of a new trial to no more than a reassessment of damages; and particularly because the granting of a new trial is in general not subject to appeal or other review."

Then came such decisions as *Gee* v. *Moss*, 108 *N. J. L.* 160; *Gormley* v. *Gasiorowski*, 110 *Id.* 287; *Rossman* v. *Newbon*, 112 *Id.* 261, and *Diamond Rubber Co., Inc.*, v. *Feldstein*, 112 *Id.* 514, wherein, for the purposes of the argument and not by way of exercising the power, the authority to reverse for abuse of discretion was merely assumed as a step toward finding that there had been no abuse: "assuming that such is the law," "assuming that to be the rule," "assuming, without deciding, that this court has the power," "conceding the legal right of appeal;" also *Koch* v. *Koll*, 110 *Id.* 293, where no abuse was found. Following these cases was the decision in *Wasker* v. *G. R. Wood, Inc.*, 114 *Id.* 266, citing *Gaffney* v. *Illingsworth* and *Gee* v. *Moss* and stating "whether action on the rule can be made the subject of review in this court as an abuse of discretion is open to question, but it is not necessary here to decide;" and among numerous other decisions the comparatively recent one in *Heuser* v. *Rothenberg*, 123 *Id.* 319: "If the action of the trial court in denying a new trial is to be reviewed at all on error, it is reversible only for the plainest abuse of discretion * * *."

In *Martin* v. *Lehigh Valley Rairoad Co.*, 114 *N. J. L.* 243, we refer to, rather than restate, the facts clearly recited in the opinion written by Mr. Justice Perskie. Sufficient to say here that Margaret Jane Martin, widow of Harry Martin, employed counsel to bring a death action, grounding in the death of her deceased spouse, Harry Martin, against the

Lehigh Valley Railroad Company. Her attorney made the mistake of entitling the summons and complaint in the name of the decedent as party plaintiff rather than in the name of the litigant wife. That the action was really by the wife for the death of her husband was obvious to any member of the legal profession and of course was known to the attorneys for the defendant company. Plaintiff's attorney later discovered the error and upon taking the matter up with the attorneys for the defendant received from the latter the suggestion, in writing, that he discontinue the pending suit and issue a new summons and complaint which "would then be considered an original suit and upon your filing security for costs would proceed as though it was an original suit." Plaintiff's attorney accordingly discontinued, and thereupon the Railroad Company moved upon the theory that the statute of limitations, which had meanwhile run its course, was a bar. There was a substitution of counsel for Mrs. Martin and an application in her behalf to set aside the discontinuance and to amend the pleadings in the first suit. The trial judge denied the application. The appeal was from that determination. Thus, a woman who, we were bound to assume, had a well grounded right of action for the death of her husband, and who employed an attorney-at-law of this state and seasonably instituted her action, actually never had her day in court and was deprived of her recovery by the ineptitude of her own counsel and the baited suggestion from opposing counsel, on its face sympathetic and helpful, actually fatal to her cause. There was no need for a discontinuance of the first suit; that door opened upon a blind drop. The defect in the pleadings was remediable by amendment and we so found. The refusal of the trial court to give relief under those circumstances was a shock to reason and to justice; and it is only when those attributes clearly mark the disposition of a rule to show cause that there is an abuse of judicial discretion which calls for a modification of the rule expressed in the Nevelle case and like cases, *supra*. Having thus indicated the measure of judicial failure necessary to a finding of abuse, we reiterate what we have heretofore frequently said, namely, that the relief is available only in

exceptional instances, that we do not, upon the pretext of an abuse of discretion, substitute our judgment for that of the trial court and that we entertain such a reason as a ground of appeal only when an abuse of judicial discretion, as we have defined that expression, has unmistakably occurred.

That a case rarely presents those qualities and that the ancient tenet is still the working rule upon which the overwhelming number of cases turn is made clear by the strong drift of the decisions in the cases which preceded *Martin* v. *Lehigh Valley* as well as in those which followed, including in the latter class *Wasker* v. *G. R. Wood, Inc., supra; DeFronzo* v. *Public Service Co-ordinated Transport,* 116 *N. J. L.* 116; *LaBell* v. *Quasdorf* (*Supreme Court*), 116 *Id.* 368; *Kople* v. *Zalon,* 122 *Id.* 422; *Trovato* v. *Capozzi,* 119 *Id.* 147; *Loughney* v. *Thomas,* 119 *Id.* 341; *Courtney* v. *Garden State Lines,* 120 *Id.* 294; *Heuser* v. *Rothenberg, supra; In re Longo,* 124 *Id.* 176, 181; *Scott-Newcomb, Inc.,* v. *Marron,* 125 *Id.* 628; *Chiesa* v. *Public Service Co-ordinated Transport,* decided contemporaneously herewith, 128 *Id.* 69; extending also to the opening of judgments, *Smith* v. *Livesey,* 67 *Id.* 269; *McDermott* v. *Paterson,* 122 *Id.* 81.

Nelson appeals from the nonsuit of his slander action against the Air Lines and Scully—the third count of the complaint. We fail to find evidence of publication sufficient to take that count to the jury. There is no proof that anyone other than the plaintiff and the defendants heard the slanderous words. To sustain an action for slander there must have been a publication. *Economopoulos* v. *A. G. Pollard Co.* (*Mass.*), 105 *N. E. Rep.* 896.

The judgment below will be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON. JJ. 16.

*For reversal*—None.