Statement of the Case.
MONROE, J.
This is an action in damages for- the alleged illegal arrest, brutal treatment, and false imprisonment of the plaintiff by the town marshal and his deputy. It appears from the evidence that plaintiff is a baker, 32 years old, with a wife and family, and that he owns the property upon and in which his bakery is conducted, and some additional land in the same square, in the town of Winnfield; that the building has a frontage to the westward on Bevill street of 30 feet, extends back (to the eastward) 60 feet, and leaves a strip of land 10 feet wide on the north side, which serves as an alley or passageway between plaintiff’s property line and the rear of the building of the Comrade Printing Office, which fronts, to the northward, on Main street, and extends back 65 feet. With the exception of the two buildings mentioned, there is none other in the square, which is said to measure 210 feet on each side, save a church, which is in the rear of the bakery and printing office, and was closed at the time of the occurrences out of which this suit has arisen. There were two rooms in plaintiff’s building, fronting on the street; that to the northward being his “shop,” and that to the southward being occupied by a tenant as a restaurant, to which, in the rear, there was attached a small kitchen. Immediately in the rear of plaintiff’s shop was a room in which was his oven, and on the south side of the oven room, behind the kitchen of the restaurant, was another room in which he mixed his dough and did other work pertaining to his business. At about 5 o’clock in the afternoon of *216 Saturday, August 19, 1911, when plaintiff and his helper had begun work on his Saturday night’s baking, several of his friends dropped in, one after another, and one of them brought with him a bottle containing some whisky, of which they partook from ' time to time. Two members of the party retired within a little while, and one of the three who remained in an attempt to exhibit his skill or strength in the handling of an empty barrel allowed the barrel to fall on the showcase in the shop, thereby breaking the showcase and attracting the attention of the town marshal, who went into the shop, and warned those who were there to be quiet and go home. Plaintiff was, however, attending to his bread at the time, and did not see the marshal or know of his visit, and the breaking of the showcase was a matter between him and his friend, which does not appear to have troubled him, and does not figure any further in this case. His three friends withdrew to the room in the rear of the shop, and, though plaintiff’s work prevented his participating with them beyond passing in and out of the room, and joining them in one toddy, he was interested that they should enjoy themselves, and about 8 o’clock, perhaps, ordered something for them to eat from his neighbor and tenant, the restaurateur. In the meanwhile the marshal had made his rounds, and, returning to the neighborhood of the bakery, decided that he had better pay it another visit. He and his deputy, whom he met at that time, went, therefore, into the alley j forming part of plaintiff’s lot, and upon which there opens a window from the room behind the shop, and from what he saw and heard by looking and listening through the window he concluded that plaintiff’s guests were not drunk, but nearly so, and that they were using profane and obscene language, which it seemed to him might be heard “anywhere around on that street,” and 'he and his deputy went around and entered the place by way of the front door, and, passing through the shop, entered the room in the rear, in which he found two of the party remaining, whom he told that, unless they behaved themselves, he would put them in jail, and while he was so threatening them the plaintiff, whom he had not before seen, came in (from the room in which he had been handling his dough) and the marshal’s testimony as to what then occurred proceeds as follows:
“He passed right tolerable close to me, and said: ‘Damn you, get out of here. You have got no right in here. Tjiese are my guests, and I will protect them in my own house.’ I was surprised at what he said, and I said: ‘John, I have got as much right in here to stop a disturbance as I have on the street, and these boys agreed once to go home, and they haven’t done it, and now, if they don’t stop this disturbance in this house, I am going to put them in jail, and, if you interfere with me, I will put yon in there.’ At this time Mr. Brewer [the deputy] stepped in between us, and said about the same thing as I did. * * * About that time, Mr. Stoehr came in front of me, and as he passed in front of me I took him by the right wrist with my left hand, and said, ‘John, behave yourself.’ I felt sure he was coming with the intention of striking me. He struck at me on the right side of the neck. I was trying to push him off of me, and I reached and pulled my gun out. I thought when he saw the gun he would quit. He struck at me once with the gun in my hand, and then I struck at him with the gun. I don’t think I hit him. I still held him, and told him to turn me loose. He was cursing, and wouldn’t do anything but rear around there, and I struck him then_ and hit him about the eye. I then turned him loose, and told him that I was going to put him in jail. He started out by Mr. Brewer, and Mr. Brewer got him by the belt. Mr. Stoehr flung loose from him, and, when Mr. Brewer’s hold broke loose, Mr. Brewer fell through the partition door. There was a pump standing there, and Mr. Stoehr reached and got hold of that pump handle, as though he was going to tear it loose, and, when he did that, I hit him again. I then ran around and got him by the waist, and carried him through the front door to the jail. Mr. Brewer caught up with us and unlocked the door, and I put him inside. I saw he was bleeding some. We put him in jail and locked the door.”
The witness then went for the doctor, who was also the mayor, and found him on the sidewalk, and they returned together.
*218 “Mr. Stoehr was standing at the door [the testimony continues]. He was waiting to get out. Dr. Siess says, ‘X want to see how bad you are hurt,’ and he says, ‘I am not hurt, I want to go back and bake my bread;’ but Dr. Siess says, ‘I want to see, John. You have got blood on you, and I want to see how bad. you are hurt.’ He insisted on going back to his bread, and we all three looked at him — • we had a light for Dr. Siess to see — and we all looked at him, and he was begging to go back to his bread, so Dr. Siess and I both agreed for him to go back, provided he would behave. Dr. Siess told him all right, he could go back, if he would keep the front door shut and keep those people out of there, and he would see about the thing later, or something of that kind. So he went back to his work.”
The testimony of the marshal was in the main corroborated by that of the deputy marshal, and there were one or two other witnesses who testified that, standing where those officers stood, near the window opening upon the alley, they heard loud talking inside, with some cursing and bad language. One of them testifies that he does not think it could have been heard on the opposite side of Bevill street; the other that he heard the noise on the opposite side of the street, near the corner below. We do not understand any of the witnesses to testify that articulate sounds emanating from the locus in guo could have been or were distinguished anywhere else save at the open window leading into the alley. On the other hand, on behalf of defendant, the editor and proprietor of the Comrade testified that he sat on his gallery, fronting on Main street, only 65 feet away, during the period of the alleged disturbance, and heard nothing; that about the time that the arrest was made he went back to his bedroom, which is opposite to, and say 15 feet-distant from, the window in the bakery building to which we have referred, and began to undress, when he heard a loud noise proceeding from that direction; that he opened his door in order to ascertain the meaning of it, and heard the defendant say, “This is mine property, and you can’t arrest me here,” shortly after which he heard what he took to he blows.
The proprietor of the restaurant, which is separated from the bakery by a wooden partition, testified that he heard the party in the bakery, and heard some profane, but no vulgar, language, and that neither he nor his guests were disturbed, and that the partition is so thin that an ordinary conversation can be heard from the one place to the other.
A witness who was near the open front of a place of business immediately across Bevill street from the bakery testified that he heard no noise or disturbance at the bakery until the arrest was made. Plaintiff’s version of the affair is as follows:
“Q. Just state how this assault was made upon you. A. They coming in the building, in my private shop where I paid my eating, and he was talking to dem fellows, * * * and I looked at my bread and came back, and asked Mr. Payne what they wanted, and he say he wanted me, and I told him I would like to see the man that takes me out of my building. Mr. Brewer come and took me by my arms, and Mr. Payne come to me and took his gun out, and started to knock me on the head. He knocked me bloody, and I took hold of the slide door to hold myself, and Mr. Payne knocked me about four times, and I left loose, and they slided me through the shop, * * * and then they took me to the jail and called Dr. Siess, and, when Dr. Siess came, he say that there is no danger in the man, and he could go home. Q. They placed you in the prison of Winnfield? A. Yes, sir. Q. How long did you remain in prison? A. Until they called Dr. Siess. Q. About how long was that? A. Ten or fifteen minutes. * * * Q. llave you since been tried in the mayor’s court? A. No, sir. Q. Have you ever been tried in any court for any offense? A. No, sir.”
There was judgment in the district court in favor of plaintiff and against the defendants in solido in the sum of $100, with legal interest from the date of the judgment. Defendants have appealed, and plaintiff has answered, praying for an increase in the amount of the award.
Opinion.
[1-3] Counsel for defendants say that plaintiff’s guests were violating an ordinance pro *220 hibiting drunkenness within the corporate limits of the town, but they have produced no such ordinance; that upon which they rely relating only to drunkenness on the streets, alleys, and public places, or within sight of such places, and not purporting to prescribe any rule of sobriety to be observed by people within their own doors or by their guests so situated. They invoke two other ordinances; the one prohibiting cursing, swearing, and the use of boisterous and indecent language “within the corporate limits,” and the other imposing a penalty for resisting the marshal in the discharge of his duty. None of the language referred to by defendants and their witnesses was repeated in the testimony, which fails to satisfy us that any articulate sounds were distinguished beyond the open window at which the listeners stationed themselves, unless, perhaps, it was in the restaurant, the proprietor of which testifies that he could hear an ordinary conversation through the thin partition which separated his place from the bakery, and that he heard some cursing, which disturbed neither him nor his customers, but heard no indecent language. The plaintiff, it may be stated, is a German, as were all his guests, save one, and he and they appear to be law-abiding people, engaged in respectable pursuits. It was Saturday night, and, if they had been in Germany, they would probably have gone to some public garden and spent the evening, drinking beer and singing songs, or listening to the music of others. The good people of Winn parish do not approve of those things, and they have the right to determine the question for themselves, but neither they nor the people of the state have made any law prohibiting a citizen from entertaining his guests upon his own premises in any decent way which does not obtrude itself offensively upon the attention of others. If the guests are young people, they may, and are apt to, become boisterous. If they are musical, they may sing songs; and, for all that the law has to say about it, they may drink what they please, and as much as they please, and indulge in whatever antics they find entertaining. The testimony, in this record, that one of plaintiffs sang, or tried to sing, a song, and that one of them was seen (through the alley window) trying to pour something (perhaps “pop”) from a bottle into the mouth of another, who was seated on the floor, or upon a box, does not, therefore, assist the defense, but merely serves to show that the marshal, being influenced by those matters, misunderstood his own duty and the rights of those with whom he interfered. It is shown, however, that the alley in question, though part of plaintiff’s lot, is left open as a thoroughfare; that the language used by plaintiff’s guests was, more or less, profane and otherwise objectionable; and that it might have been heard by those passing through the alley. We conclude, therefore, that the marshal was technically within his rights in entering the bakery in order to suppress the disturbance, though, as no one appears to have-heard it save those whose curiosity led them to the window, it appears to us that his zeal was rather of the superserviceable variety. However, since he was within the one ordinance, the plaintiff in interfering with him for the protection of his guests brought himself within the other, which imposes a penalty for resisting or interfering with the marshal in the discharge of his duty, and the marshal had the right to arrest him. On the other hand, the unnecessary brutality with which he was handled was wholly inexcusable. He weighed but 140 pounds, was unarmed and half dressed, whilst the marshal weighed 160, and his deputy, 200 pounds, and they were strong, vigorous men, who could readily have mastered the plaintiff without beating him on the head with a *222 loaded pistol, at the risk of killing him, and so lacerating his scalp that he was covered with blood. Our conclusion upon the whole case is that plaintiff is not entitled to recover damages for false arrest or imprisonment, but that $100, the total amount allowed by the district court, is inadequate compensation for the injuries to his person and his feelings resulting from the marshal’s unwarranted assault and battery. In cases of assaults committed by private citizens, where appreciable physical injury has been shown, this court has not infrequently allowed as much as $500, and where, as in this case, the offender is an officer of the law, who has taken advantage of his official position to inflict the injury complained of, we can find no reason for allowing less. Webb v. Rothschild, 49 La. Ann. 244, 21 South. 258; Turnbow v. Wimberly, 106 La. 259, 30 South. 747; Bernard v. Kelley, 118 La. 132, 42 South. 723; Chauvin v. Caldwell, 122 La. 709, 48 South. 159; Harvey v. Harvey, 124 La. 596, 50 South. 592. We do not find that Brewer, the deputy marshal, participated in the assault on plaintiff. He appears to have confined himself to the overcoming of plaintiff’s resistance by more legitimate means, and we are of opinion that as to him the judgment appealed from should be reversed.
It is therefore ordered, adjudged, and decreed that as to the defendant Rueben F. Brewer the judgment appealed from be annulled, avoided, and reversed, and plaintiff’s demand rejected and this suit dismissed at plaintiff’s cost; and as to the defendant Jackson J. Payne that said judgment be amended by increasing the amount of the award to $500, and, as thus amended, affirmed. It is further decreed that all costs paid or incurred by said Brewer be paid by plaintiff, and all other costs be paid by said Jackson J. Payne.