WILLIAM FISCH, PLAINTIFF-APPELLANT, v. GEORGE MANGER AND LEE BRANIN, T/A MANGER & BRANIN AND BERNARD CLAUSI, DEFENDANTS-RESPONDENTS.

Argued February 25, 1957—Decided April 1, 1957.

*Mr. Ishmael Sklarew* argued the cause for the appellant.

*Mr. John C. Stockel* argued the cause for the respondents.

The opinion of the court was delivered by

JACOBS, J. The plaintiff suffered serious injuries in an automobile accident and, after trial, received a jury verdict in the sum of $3,000. He applied for a new trial because of the inadequacy of the verdict but his application was denied when the defendants consented that the damages awarded to the plaintiff be increased to the sum of $7,500. The plaintiff appealed and we thereafter certified on our own motion.

On September 17, 1953 motorcycle officer Petras was on traffic duty at the intersection of Bunn's Lane and Amboy

Avenue in the Township of Woodbridge. He halted north-
and south-bound traffic along Amboy Avenue to enable the
crossing of school children. The plaintiff's car was the
third in line traveling south along Amboy Avenue and his
car came to a full stop as did the two cars ahead of him.
He was then struck in the rear by a truck owned by the
partnership defendant and driven by the individual de-
fendant. According to the testimony of both the plaintiff
and the motorcycle officer the individual defendant explained
at the scene of the accident that he thought his foot had
"slipped off the brake." At the trial he denied having made
such statement but did admit that he ran into the rear of
the plaintiff's car and that the stoplights on the plaintiff's
car were in proper working order. His story was that after
the plaintiff's car had been brought to a standstill, it started
moving again and was then brought to a very sudden stop
after having traveled about 12 feet. When the jury re-
turned its unanimous verdict its foreman stated that it had
found "negligence on the part of the truck driver." During
the application for new trial the lower court expressed the
opinion that "liability was established beyond peradventure
of a doubt," and we entertain the same view.

The plaintiff testified that when his car was struck he
"was jerked back and forth" and received "a terriffic bang"
on his head; his car went forward striking the car ahead
which in turn struck the first car in line. Although he
had received a severe impact he thought he would "be
all right" and started to drive home. On the way he
"began to get pains," stopped his car, and was ultimately
driven home by a State Trooper. He called Dr. Copleman,
who treated him during the next six weeks. Dr. Copleman
testified that his examination showed that the plaintiff was
suffering from injury to his neck and back which he diag-
nosed as "a whip lash injury, the head had been snapped
back by an impact." He treated him originally with
"sedatives and drugs for his pain * * * took x-rays
of his neck and back, gave him diathermy treatments, and
finally had to recommend that he wear a brace for his neck."

During this time the plaintiff, though he wore the recommended brace night and day, complained of much pain, and seeing little improvement Dr. Copleman recommended that the plaintiff consult Dr. Hoffman, an orthopedic physician of New Brunswick.

On the advice of Dr. Hoffman the plaintiff entered the Middlesex General Hospital on November 1, 1953 and remained there for two weeks. During that time he was placed in traction, which failed, however, to relieve his intense pain. Dr. Hoffman suspected that the plaintiff was suffering from a ruptured disc and he consulted Dr. Scheuerman, a neurological surgeon of Trenton. Dr. Scheuerman examined the plaintiff on November 17, 1953, made a diagnosis of probable ruptured disc, and recommended that he return to the hospital for further study. The plaintiff returned to the hospital on November 23, 1953 and a myelogram was performed; it confirmed that the plaintiff had a ruptured disc, and a hemilaminectomy was performed by Dr. Scheuerman with Dr. Hoffman assisting. The plaintiff was discharged from the hospital on December 10, 1953; he remained at home until February 15, 1954 and then returned to his employment, but only on a part-time basis. On July 20, 1954 he returned to the hospital where Dr. Scheuerman removed oil which had been inserted in the spinal canal during the myelogram. He did not resume full-time work until September 1954.

Dr. Scheuerman testified that he administered post-operative treatment to the plaintiff, who has continued to have some pain and is "not able to do all of the usual duties that he had previously." Dr. Hoffman testified that the operation on the plaintiff left a residual which he described as follows:

"Well, he has had a great deal of pain in the back. At one time he had a listing of the pelvis, in that the iliac crests were not level. And at that time he had a thickened sole prescribed and heel, to bring it up to normal. And he has no reflexes on the left side, no quadriceps extensor reflexes, or patellar reflexes; and he has atrophy of the calf muscles, compared with the opposite side, it is a little over a half an inch in circumference difference."

The plaintiff testified that he still is unable to perform his heavier duties and experiences back and leg pains for which he takes prescribed narcotics, is unable to sleep without sedation, and is unable to sit at one place for any substantial length of time. Both Dr. Scheuerman and Dr. Hoffman testified that there was a causal relation between the plaintiff's accident on September 17, 1953 and the hemilaminectomy which was performed thereafter. No medical testimony whatever to the contrary was introduced by the defendants, although they do urge that the plaintiff's injuries were attributable, at least in part, to an earlier accident which he suffered on February 3, 1950.

The 1950 accident resulted in a law action by the plaintiff which was later discontinued. In answers to interrogatories in that action the plaintiff stated that he was "partially prevented from attending his work between February 20th and February 27th, 1950"; that his injuries were "concussion; lumbo-sacral back sprain; vertigo; headaches; tinnitus or ringing of both ears and slight loss of hearing in both ears"; that he "will claim permanent injury to his back and loss of hearing and headaches"; and that his last medical treatments were in May and June 1950. However, the record indicates that the plaintiff actually suffered no really pertinent aftermaths of the 1950 accident. He testified (and there is nothing before us to suggest otherwise) that after February 27, 1950 and prior to his accident of September 17, 1953 he never lost a day's work "outside of having a cold or something like that," and that during that period his health was good and he engaged in sports and heavy work in normal fashion. The defendants suggest that prior to the 1953 accident the plaintiff had a "chronic back condition," which they relate to the later operation for a ruptured disc, and they refer specifically to a hospital record entry by Dr. Hoffman; but Dr. Hoffman made the entry on November 1, 1953 and explained that he was referring to the plaintiff's condition after the 1953 accident; in his own language: "I didn't say he had a chronic back prior to the accident. That was only after the accident."

The plaintiff's actual expenditures to doctors and nurses and for drugs and hospitalization exceeded $2,200. And although he received most of his normal earnings despite his temporary incapacity, there was a loss of wages approximating $620. While the jury's verdict of $3,000 just about took care of the plaintiff's actual monetary losses, it awarded substantially nothing for his suffering and permanent injuries. Its gross inadequacy was recognized by the trial judge who pointed out that "there was no dispute but that the plaintiff suffered excruciating pain, and was rendered totally helpless for a considerable period of time." On June 28, 1956 the trial judge wrote to the parties advising that unless the defendants filed a consent in writing that the verdict be increased from $3,000 to $7,500, "then the verdict heretofore rendered will be set aside and a new trial granted limited to damages only." The consent was filed by the defendants and on June 30, 1956 a formal order was entered dismissing the plaintiff's motion for a new trial. Though it was unnecessary, the plaintiff obtained leave to appeal from the Appellate Division. See *R. R.* 2:2–1; *R. R.* 4:61; *cf. State v. Richter,* 21 *N. J.* 421 (1956), *certiorari* denied 351 *U. S.* 975, 76 *S. Ct.* 1039, 100 *L. Ed.* 1492 (1956); *State v. Haines,* 20 *N. J.* 438 (1956); *Palm Beach Mercantile Co. v. Ivers,* 2 *N. J. Super.* 5 (*App. Div.* 1949); 6 *Moore's Federal Practice* 3891 (*2d ed.* 1953).

The first point which he urges in support of his appeal is that once the trial court had concluded that the damages awarded by the verdict were inadquate it had no legal power whatever to condition the grant of a new trial upon the defendants' failure to consent to a prescribed increase in the verdict. But see *Gaffney v. Illingsworth,* 90 *N. J. L.* 490, 492 (*E. & A.* 1917); *Esposito v. Lazar,* 2 *N. J.* 257, 259 (1949); *Elvin v. Public Service Coordinated Transport,* 4 *N. J. Super.* 491, 494 (*App. Div.* 1949); 1 *Bradner, New Jersey Law Practice* § 389 (*McC. Marsh* 1940); *Harris, Pleading and Practice in New Jersey* § 664 (*rev. ed.* 1939); *Sheen, New Jersey Law Practice* 458 (*2d ed.* 1931). Much has appeared in the law reviews in support of the practices

of *remittitur* and *additur* as enlightened aids in securing substantial justice between the parties without the burdensome costs, delays and harassments of new trials. See *Carlin, "Remittiturs and Additurs,"* 49 *W. Va. L. Q.* 1 (1942); *Note, "Correction of Damage Verdicts by Remittitur and Additur,"* 44 *Yale L. J.* 318 (1934); *Note, "Additur in California,"* 40 *Cal. L. Rev.* 276 (1952); *Note, "Additur and Remittitur,"* 26 *Va. L. Rev.* 836 (1940). *Cf. Millar, "Notabilia of American Civil Procedure,"* 50 *Harv. L. Rev.* 1017, 1052 (1937); *Scott, Fundamentals of Procedure in Actions at Law* 119–131 (1922). The term *remittitur* is used to describe an order denying the defendant's application for new trial on condition that the plaintiff consent to a specified reduction in the jury's award, whereas the term *additur* is used to describe an order denying the plaintiff's application for a new trial on condition that the defendant consent to a specified increase in the jury's award. While it is now recognized that the two practices are logically and realistically indistinguishable, *remittiturs* have been recognized almost everywhere, whereas *additurs* are still outlawed in some, though by no means all, of the states. Compare *O'Connor v. Papertsian,* 309 *N. Y.* 465, 131 *N. E.* 2d 883 (1956), where the New York Court of Appeals unanimously sustained an Appellate Division order which denied a new trial upon the defendant's consent to increase the $1,000 awarded by the jury to the sum of $2,500, with *Dorsey v. Barba,* 38 *Cal.* 2d 350, 240 *P.* 2d 604 (1952), where the Supreme Court of California (with Justice Traynor dissenting) held that although its courts could properly deny new trials upon consents by plaintiffs to reductions, they could not properly do so upon consents by defendants to increases. See 25 *Fordham L. Rev.* 150 (1956); 31 *N. Y. U. L. Q.* 1537 (1956); 40 *Cal. L. Rev., supra;* 10 *Wash. & Lee L. Rev.* 46 (1953).

The English precedents prior to the American Revolution are somewhat obscure and they are discussed in the majority and minority opinions in *Dimick v. Schiedt,* 293 *U. S.* 474, 55 *S. Ct.* 296, 302, 79 *L. Ed.* 603 (1935). There Justice

Sutherland, speaking for a majority of five (with Justice Stone, joined by Chief Justice Hughes and Justices Brandeis and Cardozo, dissenting) held that although *remittitur* is permissible. in the federal courts, *additur* is prohibited by the force of the provision in the Seventh Amendment that "the right to trial by jury shall be preserved, and that 'no fact tried by a jury shall be otherwise re-examined by any court of the United States, than according to the rules of the common law.' " In *Belt v. Lawes* (1884), 12 *Q. B.* 356, the court sustained the denial of a new trial upon the plaintiff's consent to accept a lesser amount than that awarded by the jury; on appeal, Brett, M. R. not only approved the practice followed below but suggested that the court would also have power "to say that the damages given are too small, but that if the defendant will agree to their being increased to such a sum as may be stated, a new trial shall be refused." *Cf. Armytage v. Haley* (1843), 4 *Q. B.* 917, 114 *Eng. Rep.* 1143. In the later case of, *Watt v. Watt* (1905), A. C. 115 the court took an opposite position and rejected the view that a court could condition a denial of a new trial on the plaintiff's acceptance of a reduced verdict. Lord Davey acknowledged that a contrary practice had grown up and that it generally served substantial justice; but he considered that there was a lack of common law power and referred to various judicial *dicta* to the effect that a jury's award of damages could not be reduced "without the consent of both parties." However, Justice Sutherland in the *Dimick* case did not follow the result in the *Watt* case and declined to upset the *remittitur* practice, first approved by Justice Story in *Blunt v. Little,* 3 *Fed. Cas. No.* 1,578 (*C. C. Mass.* 1822), and since reaffirmed in many federal decisions. See *Arkansas Valley Land & Cattle Co. v. Mann,* 130 *U. S.* 69, 9 *S. Ct.* 458, 32 *L. Ed.* 854 (1889), and the other cases cited in *Moore, supra* 3739.

In his dissenting opinion in the *Dimick* case, Justice Stone pointed out that the Seventh Amendment was concerned with substance rather than form and that the

Supreme Court had often declined to construe it as perpetuating in changeless form the minutiae of trial practice as it existed in the English courts in 1791; he referred to the many jury procedures unknown to the common law but now well established in federal practice; he considered wholly impersuasive the suggested differentiation between the settled *remillitur* practice which the majority continued and the *additur* practice which it rejected; and he concluded with the following remarks (293 *U. S.*, at *page* 496, 55 *S. Ct.*, at *page* 305, 79 *L. Ed.*, at *page* 616):

"Appellate federal courts, although without common law precedent, have not hesitated to resort to the *remittitur* where, by its use, the necessity of a new trial could justly be avoided. *Bank of Kentucky v. Ashley*, 2 *Pet.* 327, 329, 7 *L. Ed.* 440, [441]; *Phillips & C. Constr. Co. v. Seymour*, 91 *U. S.* 646, 656, 23 *L. Ed.* 341, [345]; *Hopkins v. Orr*, 124 *U. S.* 510, 514, 8 *S. Ct.* 590, 31 *L. Ed.* 523, [525]; *Washington & G. R. Co. v. Harmon's Adm'r* (*Washington & G. R. Co. v. Tobriner*), 147 *U. S.* 571, 590, 13 *S. Ct.* 557, 37 *L. Ed.* 284, [291]; *Hansen v. Boyd*, 161 *U. S.* 397, 411, 412, 16 *S. Ct.* 571, 40 *L. Ed.* 746, [751]. The trial judge who denies a motion for a new trial, because the plaintiff has consented to reduce, or a defendant has consented to increase, the amount of the recovery, does no more than when, sitting in equity, he withholds relief upon the compliance with a condition, the performance of which will do substantial justice. See *Harrisonville v. W. S. Dickey Clay Mfg. Co.*, 289 *U. S.* 334, 338, 53 *S. Ct.* 602, 77 *L. Ed.* 1208, [1211].

To me it seems an indefensible anachronism for the law to reject the like principle of decision, in reviewing on appeal denials of motions for new trial, where the plaintiff has consented to decrease the judgment or the defendant has consented to increase it by the proper amount, or to apply it in the one case and reject it in the other. It is difficult to see upon what principle the denial of a motion for a new trial, which for centuries has been regarded as so much a matter of discretion that it is not disturbed when its only support may be a bad or inadequate reason, may nevertheless be set aside on appeal when it is supported by a good one: That the defendant has bound himself to pay an increased amount of damages which the court judicially knows is within the limits of a proper verdict."

The majority opinion in *Dimick* has been the subject of much criticism and it is doubtful whether the Supreme Court would still subscribe to it; in any event, the Seventh

Amendment differs somewhat from our constitutional provision and has no application to proceedings in our state courts. *Walker v. Sauvinet,* 92 *U. S.* 90, 23 *L. Ed.* 678 (1876); *Pearson v. Yewdall,* 95 *U. S.* 294, 24 *L. Ed.* 436 (1877). *Cf. Maxwell v. Dow,* 176 *U. S.* 581, 20 *S. Ct.* 448, 44 *L. Ed.* 597 (1900); *Fay v. People of State of New York,* 332 *U. S.* 261, 288, 67 *S. Ct.* 1613, 91 *L. Ed.* 2043, 2060 (1947). We must look primarily to our own history and precedents in ascertaining whether the highly desirable practices of *remittitur* and *additur* may be adhered to in our State without infringement of *Art.* I, *par.* 9 of the 1947 *Constitution* which provides as follows:

"The right of trial by jury shall remain inviolate; but the Legislature may authorize the trial of civil causes by a jury of six persons when the matter in dispute does not exceed fifty dollars. The Legislature may provide that in any civil cause a verdict may be rendered by not less than five-sixths of the jury. The Legislature may authorize the trial of the issue of mental incompetency without a jury."

The *Constitution of* 1776 had provided (*Art.* XXII) that "the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever"; and the *Constitution of* 1844 had provided (*Art.* I, *par.* 7) that "the right of trial by jury shall remain inviolate; but the legislature may authorize the trial of civil suits, when the matter in dispute does not exceed fifty dollars, by a jury of six men." But our high courts have consistently recognized that the treasured constitutional right of trial by jury relates to substance rather than form and does not preclude efficient procedural devices which, though perhaps not strictly part of the English common law, are nevertheless wholly consistent with the fundamental right of the parties to have the facts determined by a fair and impartial jury acting under appropriate judicial guidance and control. In *Clayton v. Clark,* 55 *N. J. L.* 539, 540 (*Sup. Ct.* 1893), the court noted that the Constitution provides that the right to trial by jury "shall remain inviolate, not that it

shall be unalterable," and later decisions have embodied the same expression. See *State v. DeLorenzo,* 81 *N. J. L.* 613, 616 (*E. & A.* 1911); *Sexton v. Newark Dist. Telegraph Co.,* 84 *N. J. L.* 85, 101 (*Sup. Ct.* 1913), affirmed 86 *N. J. L.* 701 (*E. & A.* 1914); *Robinson v. Payne,* 99 *N. J. L.* 135, 141 (*E. & A.* 1923). Similarly, in *Humphrey v. Eakeley,* 72 *N. J. L.* 424, 426 (*Sup. Ct.* 1905), affirmed 74 *N. J. L.* 599 (*E. & A.* 1907), the court stressed that the constitutional language imports freedom from harm or substantial impairment but not "immunity from all regulation." See *State v. Maier,* 13 *N. J.* 235, 276 (1953).

The *remittitur* practice has been recognized in New Jersey since early days. *New Jersey Flax Cotton Wool Co. v. Mills,* 26 *N. J. L.* 60, 63 (*Sup. Ct.* 1856); *Rafferty v. Bank of Jersey City,* 33 *N. J. L.* 368, 372 (*Sup. Ct.* 1869); *Rafferty v. Erie R. Co.,* 66 *N. J. L.* 444, 450 (*Sup. Ct.* 1901); *Harris, supra.* Not until 1916 was it questioned, but the Court of Errors and Appeals found little difficulty in sustaining it. *Heinz v. Delaware, L. & W. R. Co.,* 90 *N. J. L.* 198 (*E. & A.* 1916). Justice Trenchard, speaking for a unanimous court, pointed out that in England the power had been denied in *Watt v. Watt, supra* (which had in turn overruled *Belt v. Lawes, supra*), but that in our State it had frequently been invoked "to do substantial justice and save the expense of a new trial" and that it was "in no sense an impairment of the constitutional right of trial by jury." During the following year, the Court of Errors and Appeals had occasion to deal with a negligence case in which the practice of *additur* had been invoked. *Gaffney v. Illingsworth, supra.* The jury had returned a verdict of $190.25 and Judge Dungan thereafter announced that if the defendant would consent to pay the sum of $480.50 rather than the amount awarded by the jury, he would deny the plaintiff's application for a new trial; the defendant declined and a new trial limited to damages was awarded. The defendant appealed, contending that the trial court had no authority to set aside a verdict and grant a new trial as to damages alone. Notwithstanding the absence of any such common

law power (*Scott, supra,* 112) the Court of Errors and Appeals summarily disposed of the defendant's contention by reference to the provisions of the Practice Act of 1912 and the implementing court rules, which explicitly provided for new trials limited to damages. See *Robinson v. Payne, supra.* The defendant also urged that the *additur* condition imposed by Judge Dungan was beyond his power; in response, Chancellor Walker, speaking for the entire court, had this to say (90 *N. J. L.,* at *page* 492):

"The power of the court in granting a new trial upon the ground that the damages are *excessive*, upon terms that a new trial shall be had unless the plaintiff will accept a certain sum named, less than that awarded by a verdict, is too well established to be questioned. It would seem to follow, by parity of reasoning, that when a new trial is granted because the damages are inadequate, the court may impose like terms, that is, terms to the effect that if the defeated party will pay a certain sum, greater than that awarded by the verdict, the rule will be discharged, subject, doubtless, to the power of an appellate court to vacate any such terms when they appear to be an abuse of discretion. No such showing is made on the record before us, and this makes it inappropriate for us to give consideration to the appellant's other contention, namely, that the verdict, as it stands, is adequate and proper and evinces no prejudice or partiality on the part of the jury. As to whether or not the verdict is adequate and proper is, on application for a new trial, a matter of sound discretion in the trial court, and, in the absence of an abuse of discretion, the appellate court cannot review the trial court's action. And with the question of damages, apart from such discretion, we have nothing to do."

The *Gaffney* case was widely accepted as upholding *additur* as well as *remittitur* in our State. *Scott, supra,* 128; *Carlin, supra,* 25; *Harris, supra; Bradner, supra.* Thus, Dean Harris in his book on *Pleading and Practice* and Professor Marsh in his revision of *Bradner* stated unequivocally that the trial court had power to condition its denial of a new trial upon the plaintiff's consent to accept a reduced amount or upon the defendant's consent to pay an increased amount. The following summary in 1939 by Dean Harris may be said to have represented the general understanding by the bench and bar:

"In granting a new trial on the ground that the verdict is excessive, the court in its discretion may give the plaintiff the option either of accepting a specified reduced amount of verdict, or being put to a new trial. Similarly, when the verdict is, in the opinion of the court, inadequate, the court may give the defendant the option either of paying a greater sum than awarded by the verdict or of submitting himself to a new trial. The power to impose such terms is inherent in the court and is regulated by the rules of the Supreme Court. Such power may be exercised in contract actions, as well as in tort actions involving unliquidated damages. The exercise of the power of the court in imposing such terms upon the parties is discretionary, and in the absence of an abuse of discretion, not subject to an appeal. This is one of the constitutional prerogatives of the court, which cannot be interfered with by legislation." *Harris, supra,* § 664.

The delegates to our Constitutional Convention of 1947 included many members of the legal profession who sought to furnish our State with a modern judicial structure which would retain benefits of the old while acquiring advantages of the new. Though aware of the high function of the jury system as an instrument of justice, they knew that it had been constitutionally subject to enlightened judicial controls and regulations which did not impair its basic integrity. Thus they were fully familiar with the trial court's power to withdraw a case from the jury because of the insufficiency of the evidence (*Harris, supra,* §§ 535, 538), to require that the jury render a special verdict or answer special interrogatories (*Harris, supra,* § 555), and to grant or deny a total or partial new trial upon terms which might include *remittitur* or *additur* (*Harris, supra,* § 664). At no point during the Constitutional Convention or thereafter was there any suggestion that these preexisting judicial controls and regulations should in anywise be curbed; on the contrary, the significant movement relating to the right to trial by jury was in itself designed to avoid "costly retrials" (1 *Record of Proceedings, Const. Conv. of* 1947, *p.* 610) and resulted in the express constitutional provision authorizing the Legislature to provide for five-sixths verdicts in civil cases. *Const.* 1947, *Art.* I, *par.* 9.

Shortly after the adoption of the 1947 Constitution our courts had occasion to deal anew with the practices of

*remittitur* and *additur.* In *Esposito v. Lazar, supra,* the jury returned a verdict for plaintiff in the sum of $1,200; the trial court found the damages inadequate and ordered a new trial limited to damages unless the defendant consented to increasing the award to $3,500. The defendant refused and on retrial the jury awarded $3,000. On appeal, this court, in an opinion by Justice Ackerson, approvingly cited *Gaffney v. Illingsworth, supra,* and expressly recognized that a trial court has discretionary power to deny a new trial upon the plaintiff's consent to accept a reduced amount or upon the defendant's consent to pay a larger amount. See 2 *N. J.,* at *page* 259. It held, however, that in the case before it the new trial should not have been limited to damages because the original jury verdict appeared to represent a compromise finding on the issue of liability. See *Hendrikson v. Koppers Co., Inc.,* 11 *N. J.* 600, 608 (1953); *Juliano v. Abeles,* 114 *N. J. L.* 510 (*Sup. Ct.* 1935). *Cf. Dahle v. Goodheer,* 38 *N. J. Super.* 210 (*App. Div.* 1955), *certiorari* denied 20 *N. J.* 534 (1956).

In *Elvin v. Public Service Coordinated Transport, supra,* the Appellate Division summarized the pertinent judicial controls which had been exercised in our old practice and have been continued in our new; in the course of his opinion for the court, Judge McGeehan said:

"In New Jersey, the judge in the trial of a negligence action has certain recognized controls over the jury verdict when he deems it inadequate. Under *Rule* 3:59–1 the judge may grant a new trial as to all or part of the issues, upon motion made to him. Under *Rule* 3:59–4 the judge, of his own initiative, may order a new trial for any reason for which he might have granted a new trial upon motion of a party. Further, the judge, in his discretion, may give the defendant the option of paying a stated increase in the amount of the verdict or of going on to a new trial as to the amount of damages, subject to the power of an appellate court to vacate any such terms when they appear to be an abuse of discretion. *Esposito v. Lazar,* 2 *N. J.* 257 (1949), which is a control not permitted in the Federal courts; *Dimick v. Schiedt,* 293 *U. S.* 474, 79 *L. Ed.* 603 [1935], or in the English courts (*Watt v. Watt* (1905), *A. C.* 115, 6 *B. R. C.* 1)."

In the light of all of the foregoing, we are satisfied that the practices of *remittitur* and *additur* violate none of our constitutional interdictions and, if fairly invoked, serve the laudable purpose of avoiding a further trial where substantial justice may be attained on the basis of the original trial. See *Meszaros v. Gransamer*, 23 *N. J.* 179 (1957). Accordingly, we reject the first point urged by the plaintiff and come now to his meritorious contention that, in any event, the prescribed increase to $7,500 was "grossly inadequate and should be set aside." Notwithstanding earlier doubts (*Nelson v. Eastern Air Lines, Inc.*, 128 *N. J. L.* 46, 55 (*E. & A.* 1941)) there is now no question as to the power of our appellate courts to reverse a trial court's refusal to grant a new trial (whether or not conditioned on *remittitur* or *additur*) where it is satisfied that there has been "an abuse of discretion" (*Esposito v. Lazar, supra; Elvin v. Public Service Coordinated Transport, supra*) or, in the more modern terminology, "'a manifest denial of justice.'" See *Lindroth v. Christ Hospital*, 21 *N. J.* 588, 596 (1956); *Conklin v. Miele's Motor Transportation, Inc.*, 43 *N. J. Super.* 420, 428 (*App. Div.* 1957). In the instant matter, we believe that the trial judge had a mistaken notion of the evidence which led to his prescribing the scanty sum of $7,500. He stated that the plaintiff was not entitled to a "great sum, because he certainly did have a back condition before this accident occurred"; but the evidence in the record points to the view that whatever "back condition" the plaintiff had as a result of the 1950 accident had cleared up and had no relation to the very severe injuries resulting from the 1953 accident. Under these highly special circumstances, we believe that the trial court's action should not be permitted to stand and that the interests of justice will best be served by permitting a second jury to pass on the issue of damages. The separable issue of liability was clearly and properly decided against the defendants; under the evidence it could hardly have been determined otherwise and need not be submitted for redetermination. *R. R.* 4:61–1; *Dahle v. Goodheer, supra.*

Reversed, with direction for a new trial on the issue of damages.

HEHER, J. (concurring in result). The right of trial by jury secured by *Article* I, *paragraph* 9 of the 1947 *State Constitution,* as under like guaranties of the 1844 *Constitution, Article* I, *paragraph* 7, and the 1776 *Constitution, Article* XXII, "is the right as it existed at common law *and* remained on July 2, 1776," not as enlarged by statute, as if "* * * each constitutional provision speaks anew as of the time of the adoption of the instrument of which it is a part * * *." *Town of Montclair v. Stanoyevich,* 6 *N. J.* 479 (1951). See *Board of Health of Weehawken Tp. v. New York Central R. Co.,* 10 *N. J.* 294 (1952). The right "* * * is not to be impaired or diminished, but is to remain as it existed at common law, and according to the practice of the courts anterior to the establishment of the fundamental law." *State v. Doty,* 32 *N. J. L.* 403 (*Sup. Ct.* 1868), Beasley, C. J. See also *Howe v. Treasurer of Plainfield,* 37 *N. J. L.* 145 (*Sup. Ct.* 1874). The jurors "compose the appropriate tribunal for the determination of controverted questions of fact * * *." *Kohl v. State,* 59 *N. J. L.* 445 (*E. & A.* 1896). And see *State v. Knight,* 96 *N. J. L.* 461 (*E. & A.* 1921). Trial by jury as the means of determining "questions of fact" is of great antiquity, importing a jury of 12 men, impartially selected, whose verdict was required to be by the concurrence of all. *Brown v. State of New Jersey,* 62 *N. J. L.* 666 (*E. & A.* 1899), affirmed 175 *U. S.* 172, 20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899). The constitutional requirement that "the right to a trial by jury shall remain inviolate" guarantees "the opportunity to submit common law rights to a tribunal that shall possess the attributes of the historical jury as it existed at the time of the adoption of the organic law." *Clayton v. Clark,* 55 *N. J. L.* 539 (*Sup. Ct.* 1893).

And the constitutional right of trial by jury controls the exercise of judicial power at the trial level to set aside a verdict as contrary to the weight of the evidence and for

appellate relief to the same end; the court "may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury," but if the verdict be "so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality," it transcends the constitutional province of the jury and is remediable as an excess of power; the court may not set aside a verdict merely because, in its opinion, the jury upon the evidence might well have found otherwise; and this conception of the weight of the evidence applies to civil and criminal cases. *Hager v. Weber,* 7 *N. J.* 201 (1951).

As is shown by Justice Sutherland's analysis of the case history in *Dimick v. Schiedt,* 293 *U. S.* 474, 55 *S. Ct.* 296, 79 *L. Ed.* 603 (1935), there was no power in the English courts at the time of the adoption of the New Jersey Constitution of 1776 to increase, either absolutely or conditionally, the damages fixed by a jury in a case such as this. The power to increase the award had been exercised on occasion (a) in actions for mayhem, upon view of the party maimed; (b) where damages had been assessed upon a writ of inquiry, and then upon the ground that the justices might themselves have awarded damages without the writ; and (c) in some of the old cases where the amount of the plaintiff's demand was certain, as, for example, in an action of debt.

In *Beardmore v. Carrington,* 2 *Wils.* 244, 95 *Eng. Repr.* 790, decided in 1764, the holding was that the English courts were without power either to increase or reduce damages in any action for a personal tort, unless in the exceptional cases noted *ante.* The practice of granting new trials was there termed "modern," a power courts "anciently never exercised," although "in some particular cases they corrected the damages from evidence laid before them." The court continued:

"There is great difference between cases of damages which [may] be certainly seen, and such as are ideal, as between assumpsit, trespass for goods where the sum and value may be measured, and

actions of imprisonment, malicious prosecution, slander and other personal torts, where the damages are matter of opinion, speculation, ideal; there is also a difference between a principal verdict of a jury, and a writ of inquiry of damages, the latter being only an inquest of office to inform the conscience of the Court, and which they might have assessed themselves without any inquest at all; only in the case of maihem, Courts have in all ages interposed in that single instance only; as to the case of the writ of inquiry in the Year-Book of H.4, we doubt whether what is said by the Court in that case be right, that they would abridge the damages unless the plaintiff would release part thereof, because there is not one case to be found in the Year-Books where ever the Court abridged the damages after a principal verdict, and this is clear down to the time of [*Hawkim v. Soiet*] *Palmer's Rep.* 314, [81 *Eng. Repr.*, 1099] much less have they interposed in increasing damages, except in the case of maihem; * * *."

And in *Mayne's Treatise on Damages* (*9th ed.*), 571, the first edition of which was published in 1856, it is said that "in cases where the amount of damages was uncertain their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it." The author continues, *p.* 580:

"When an excessive verdict is given, it is usual for the judge to suggest to counsel to agree on a sum, to prevent the necessity of a new trial. In the absence of agreement the Court has no power to reduce the damages to a reasonable sum instead of ordering a new trial. It would seem also from what was said in the case in which this was recently decided, that where the damages are too small, the Court cannot with the defendant's consent increase them, if the plaintiff asks for a new trial."

In *Watt v. Watt* (1905), *A. C.* 115, 6 *B. R. C.* 1, 2 *Ann. Cas.* 672, the House of Lords said the idea that the court could with the consent of the plaintiff reduce the amount of the damages probably arose from the fact that in the old cases the courts had "adopted the somewhat unconstitutional proceeding of refusing to give the plaintiff judgment unless he would consent to reduce his claim to what ought to be considered reasonable," an indirect method implying the need for the plaintiff's assent; and that since the defendant was not likely to refuse his assent to a proceeding intended for his benefit, the theory of the cases seems to

have been that the right of the court to interfere with the verdict depended upon the consent of both parties; and the contrary hypothesis here contended for was utterly repudiated as alien to the common law and sound English practice.

The Earl of Halsbury, L. C. there affirmed that the Court of Appeal "has no jurisdiction to fix the amount of damages without the consent of both parties"; he attributed the "confusion" in this regard to the practice upon demurrer or default, where the court may have the sheriff assess the damages, the usual course, or "* * * decide that question for itself—probably because that question is often a question of law, where the damages are fixed by law * * *," and he noted the "* * * distinction between trial by jury and mere inquisition or inquiry by a jury to assess damages—that, in the latter case the inquisition was only to inform the mind of the court and it was at their discretion whether they would award judgment for the amount found by the jury, where as upon a trial they had no jurisdiction to interfere as to the amount of damages in cases of tort," citing *Reeves' History of the Common Law,* and that the "theory of all the cases seems to me to be that the right of the court to interfere with a jury's verdict was only to be by the assent of both parties."

And Lord Robertson declared the contrary view "is on principle indefensible."

In the later case of *Barber & Co. v. Deutsche Bank* (1919), *A. C.* 304, *H. L.,* Lord Phillimore affirmed the true principle to be this:

"Where damages are at large and the Court of Appeal is of opinion that the sum awarded is so unreasonable as to show that the jury has not approached the subject in a proper judicial temper, has admitted considerations which it ought not to have admitted, or rejected or neglected considerations which it ought to have applied, it is the right of the party aggrieved to have a new trial. He is not to be put off by the Court saying that it will form its opinion as to the proper sum to be awarded, and reduce or enlarge the damages accordingly. He is entitled to an assessment by a jury which acts properly. He is not to be put off by a composite de-

cision, or I might describe it as a resultant of two imperfect forces—an assessment partly made by a jury which has acted improperly and partly by a tribunal which has no power to assess."

And so, in *Dimick v. Schiedt, supra,* Justice Sutherland concluded, and with unquestionable authority, that "while there was some practice to the contrary in respect of *decreasing* damages, the established practice and the rule of the common law, as it existed in England at the time of the adoption of the Constitution, forbade the court to *increase* the amount of damages awarded by a jury in actions such as that here under consideration." He observed that "this court in a very special sense is charged with the duty of construing and upholding the Constitution; and in the discharge of that important duty, it ever must be alert to see that a doubtful precedent [involving *remittitur*] be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be a principle of the fundamental law of the land"; and that "the power to conditionally increase the verdict of a jury does not follow as a necessary corollary from the power to conditionally decrease it," since in the case of a conditional *remittitur* "a jury has already awarded a sum in excess of that fixed by the court as a basis for a *remittitur,* which at least finds some support in the early English practice, while in the second case, no jury has ever passed on the increased amount, and the practice has no precedent according to the rules of the common law."

The "controlling distinction between the power of the court and that of the jury," said Justice Sutherland, "is that the former is the power to determine the law and the latter to determine the facts," and while the *remittitur* practice in the case of an excessive verdict "is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess,—in the sense that it has been found by the jury,—and that the *remittitur* has the effect of merely lopping off an excrescence," yet where an inadequate verdict is increased by the court there is a "bald addition of something which in no sense can be

said to be included in the verdict," and if that be done with the consent of the defendant alone, the plaintiff is compelled to forego his "constitutional right to the verdict of a jury and accept 'an assessement partly made by a jury which has acted improperly, and partly by a tribunal which has no power to assess.' "

It was there pointed out that while the *remittitur* practice had acceptance in the federal jurisdiction for more than a century, following Justice Story's ruling at the circuit in *Blunt v. Lillle, Fed. Cas. No. 1,578, 3 Mason* 102 (*C. C.* 1822), no federal court had undertaken to increase a jury award of damages, although there are numerous cases in which a new trial was granted for inadequate damages. And this is equally true of New Jersey, save that in *Gaffney v. Illingsworth,* 90 *N. J. L.* 490 (*E. & A.* 1917), a new trial was ordered unless the defendant would consent to an increase of the jury's verdict of $190.25 for the plaintiff to $480.50. In *Esposito v. Lazar,* 2 *N. J.* 257 (1949), error was found in the award of a new trial limited to damages in that the amount of the verdict indicated a "compromise" on liability.

There can be no doubt that the *additur* practice sanctioned here contravenes the essence of the common-law right of trial by jury at the time of the adoption of the 1776 Constitution, then and ever since a basic right under the law of England; and this is the very substance of our own constitutional guaranty. We are still a common-law State; and the essential principles of the common law are in force except as modified by our own Constitution and statutes enacted in keeping with the Constitution. This, in virtue of an explicit constitutional mandate. *Taneian v. Meghrigian,* 15 *N. J.* 267 (1954).

The reasoning of the minority in *Dimick* proceeds on the hypothesis, "long accepted in the federal courts," that the "exercise of judicial discretion in denying a motion for a new trial, on the ground that the verdict is too small or too large, is not subject to review on writ of error or appeal," a "special application of the more general rule that an

appellate court will not re-examine the facts which induced the trial court to grant or deny a new trial," and the unwilling plaintiff whose inadequate verdict has been increased by the court "has suffered no denial of a right because the court, staying its hand, has left the verdict undisturbed, as it lawfully might have done if the defendant had refused to pay more than the verdict," and, although the common law had made no rule on the subject in 1791, the court could not "rightly refuse to apply to either the principle of general application that it is competent to exercise a discretionary power to grant or withhold relief in any way which is not unjust," analogizing the judge's function, "when sitting in equity," to withhold "relief upon the compliance with a condition, the performance of which will do substantial justice," citing *Belt v. Lawes, L. R.* 12 *Q. B. Div.* 356 (*C. A.* 1884), a *remittitur* case overruled by the House of Lords in *Watt v. Watt,* cited *supra.*

But this rationale does not take into account the basic quality of our own constitutional right of trial by jury, after the mode and manner and essentiality of the common law, to this very day "the glory of the English law" and "the most transcendant privilege which any subject can enjoy," to use the words of Blackstone, *Bk.* 3, *p.* 379. And the *additur* principle is without general acceptance in this country, and for the given reasons. See annotation to *Dimick* in 95 *A. L. R.* 1163; *Burdict v. Missouri Pac. Ry. Co.,* 123 *Mo.* 227, 27 *S. W.* 453, 26 *L. R. A.* 384 (*Sup. Ct.* 1894); also 39 *Am. Jur.* 206; 3 *Am. Jur.* 688. It is a doctrine of the civil law. *Southall v. Smith,* 151 *La.* 967, 92 *So.* 402, 27 *A. L. R.* 1194 (*Sup. Ct.* 1922); *Stoehr v. Payne,* 132 *La.* 213, 61 *So.* 206, 44 *L. R. A., N. S.* 604 (*Sup. Ct.* 1913). The question is one of constitutional power rather than procedural expediency.

No one would contend that the court has an absolute right to assess unliquidated damages in an action at law for a personal tort; and yet can it be other than that when the court in these circumstances imposes its judgment on the unwilling plaintiff? We are not concerned here with an

action for liquidated damages, or damages fixed by a mere mathematical calculation from ascertained data or capable of certain computation on the record made, or a submission to the court without a jury on a stipulation of the facts. See 3 *Am. Jur., Appeal and Error, section* 1180.

If the trial judge has the power asserted here, so also is it the province of this court on a review of the sufficiency or insufficiency of an award by a jury. The issue of the weight of the evidence is now cognizable on appeal. *Hager v. Weber, supra. R. R.* 1:5–3 provides that a verdict of a jury "shall be set aside as against the weight of the evidence if, having given due regard to the opportunity of the trial court and the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." And yet this court does not undertake to supply the deficiency in the assessment of the damages by the trial judge, nor remand the cause for a reassessment by the judge, but directs a new jury trial limited to damages. .

I concur in this result.

Mr. Justice OLIPHANT joins in this opinion.

HEHER and OLIPHANT, JJ., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and WEINTRAUB—6.

*For affirmance*—None.