59 N.J. Super. 511 (1960)
158 A.2d 218
SABINA PAWLOWSKI, PLAINTIFF-RESPONDENT,
v.
ANTHONY F. MARINO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 1960.
Decided February 18, 1960.
*512 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Peter J. Devine, Jr., argued the cause for defendant appellant (Messrs. Kisselman, Devine and Deighan, attorneys; Mr. Devine on the brief).
*513 Mr. Francis E. Gazdzinski argued the cause for plaintiff-respondent.
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff, Sabina Pawlowski, instituted this negligence action to recover for personal injuries and property damages resulting from a motor vehicle collision in which her car was negligently rammed in the rear by a car driven by the defendant Nicholas F. Marino. A jury of the Law Division found the defendant to have been solely responsible for the accident and awarded a verdict of $20,000 to the plaintiff. The defendant moved for a new trial on the single ground that the verdict was excessive, against the weight of the evidence, and the result of passion, bias, prejudice, and sympathy. The trial judge denied the motion, and this appeal followed. Liability is not disputed; hence the main question presented concerns the excessiveness of the damages awarded.
Plaintiff, a 33-year-old single woman, operated a retail florist business from the home of Mrs. Helen Wasiolek, where plaintiff had also resided for nine years. She had been engaged in this business for a year and a half prior to the collision. On November 9, 1957 plaintiff was driving a wholesale florist salesman, one Parker, from his Camden shop to the Garden State Racetrack. Upon arriving in the vicinity of the track, she brought her car to a stop in the left lane preparatory to making a left turn to let Parker off at the track entrance. Her turn signal was in operation. Suddenly her car was struck a "terrific bang" from the rear by the Marino automobile. Plaintiff's head went forward and backward, and a number of bobby pins "flew out" of her hair. Her car was pushed forward for a distance of ten feet and her door sprung open. Parker was not injured, and plaintiff told him and the defendant that she was not hurt. Marino, a college student, admitted liability, the parties exchanged licenses and other information, and plaintiff drove off in due course. She returned to the Wasiolek home, felt "shaky *514 and nervous," rested for a while, and went on with what she "was supposed to do" that Saturday.
On Sunday, November 10, plaintiff began to feel a stiffness of the neck, headaches, and a swelling of the right hand. The headaches and stiffness of the neck are associated with what are commonly known as "whiplash" injuries. On Tuesday, November 12, she consulted Dr. Paul T. Milnamow and was treated by him on 23 occasions during a two-month period ending on January 17, 1958. Dr. Milnamow, whose work is "partially limited to general surgery," gave plaintiff "therapy treatment" and pills and ordered X-rays to be taken by a radiologist, Dr. Tropea. In this period, plaintiff also allegedly developed a condition of losing her balance, caused by a buckling of the right knee. This condition was not a separate ailment but was claimed to be "part and parcel" of the main injury to the neck.
Referring to his records, Dr. Milnamow testified:
"[M]ostly her complaints were to the back of her neck on the right side and extending down into the shoulder. Now, any other complaints I feel were minimal and I did not take particular note of them."
Dr. Tropea was not produced as a witness, and his X-ray report was not in Dr. Milnamow's file. The latter recalled, however, that the report was negative on any fractures in the cervical (neck) region, but that it did mention a subluxation of the fourth cervical vertebra. A subluxation is a dislocation or "slipping in and out of a vertebra." There are degrees of subluxation, varying from 1% to 99%, on a scale of "mild, moderate and severe." Dr. Milnamow explained the fact that none of his records mentioned a subluxation by emphasizing that it was a "very mild one," and "mild enough that I overlooked it." He testified he was not certain at that time that plaintiff had a subluxation of any degree. His prognosis in November 1957 was that plaintiff's disability would subside in nine weeks. On January 17, 1958  just over nine weeks after he first saw plaintiff  he concluded treatment of the plaintiff. He also supplied her *515 with the names of some orthopedic specialists, none of whom plaintiff visited.
At the request of defendant's attorney, Dr. George W. Grenhart examined plaintiff on January 21, 1958. He testified that there was no muscle spasm present, which meant that "she was not having severe pain." He noted some tenderness over the region of the fourth cervical vertebra, but that there was no restriction of neck motion. His diagnosis was a whiplash injury.
From January to June 1958 plaintiff did not see another doctor, but was "hoping from day to day that this would go away." In June she sought attention from Dr. Anthony F. DePalma, a specialist in orthopedic surgery located in Philadelphia, whose deposition was introduced on plaintiff's case. Dr. DePalma found a presence of muscle spasm, and plaintiff experienced pain when pressure was applied to the lower cervical region. His diagnosis, based on his X-ray examination, was that she had a mild subluxation and sprain of the cervical spine. He advised plaintiff to restrict her activities, to wear a felt collar, and to start exercising the cervical spine by wearing a weight on her head. He described plaintiff's injury as painful and disabling. Dr. DePalma saw her on 13 visits. In November 1958, plaintiff's symptoms had diminished, she asked to take the collar off, and he advised her to take it off for short periods during the day. By March 6, 1959, the last visit, plaintiff had "improved considerably," had no muscle spasm and, in Dr. DePalma's judgment, required no further attention, even though the mild subluxation was permanent. He told her not to wear the collar unless she had further symptoms. Dr. DePalma deposed on direct examination, "It is my feeling that she is overly apprehensive and concerned with her problem."
Dr. Grenhart examined the plaintiff a second time on October 6, 1958 and found her complaining more than she had the previous January. He testified there was no need for her to have been wearing the collar and that "her complaints at this time were more on a nervous basis."
*516 For trial purposes, Dr. Milnamow examined plaintiff on April 14, 1959. He had before him Dr. DePalma's deposition wherein the latter had estimated that the patient had a 15% permanent disability, not in respect of bodily function, but "insofar as her activities are concerned." Dr. Milnamow testified to the same 15% permanent disability although neither at the time he had treated plaintiff nor afterward had he ventured any permanent disability estimate. Asked on direct examination to explain what he meant by a 15% overall disability, Dr. Milnamow said:
"Well, Sabina had a very great psychic overlay in this thing. She was depressed, she felt very nervous about the condition, her pain slowed her activities, and she had some limitation of motion, so that I feel with this overall picture that she has approximately 15 per cent of her activity curtailed."
In May 1959 there was a mistrial in this case and plaintiff at that time appeared in court without her neck brace. When the trial began again on Thursday, June 18, plaintiff wore her collar. On Friday, June 19, there was a trial recess and plaintiff spent the day making up a corsage and shopping with Mrs. Wasiolek; she wore the collar for but an hour and a half during the day. On Saturday and Sunday she did not wear the collar except for sleeping purposes, but when the trial resumed on Monday plaintiff resumed wearing the collar and did so during the remaining two days of the trial. The only stated explanation for this behavior was that the collar prevented her from falling asleep in front of everyone, which she was inclined to do when "a little bit excited."
Plaintiff testified that as of the time of trial she was still having difficulties with her neck; that her right hand was numb even as she spoke; that she could not turn her head much more than one inch while driving and was either required to turn her whole body or rely on Mrs. Wasiolek to make the necessary observations; and that she could not lift her 24-pound niece. As to her business, plaintiff said, "I have no business today." In the week following the accident, *517 she began compiling a list of orders she alleged she had to refuse due to physical inability to make them up; but income tax returns disclosed that her net earnings of $1,000.75 in 1957 only dropped to $695 in 1958. Her explanation for starting such a list was that she might have the names of prospective customers when she could return to her florist business. She admitted that over the weekend which intervened during the trial she drove her car, marketed, purchased flowers from a wholesale supplier, delivered them, went to church and went to see her mother. It was further elicited that in December 1958 she had carried a case of six soda bottles. In 1958, when her injuries were allegedly most disabling, she did a gross business of $3,149.08.
Plaintiff's total medical expenses were but $395, and the property damage to her car was $113. It bears repetition that the jury, on the foregoing evidence, found the defendant liable in the sum of $20,000.
Whether a verdict is so excessive as to be contrary to the weight of the evidence is an issue now cognizable on appeal. The appellate correctional process is invocable "if, having given due regard to the opportunity of the trial court and the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion." R.R. 1:5-3(a); Hager v. Weber, 7 N.J. 201, 210 (1951); Wytupeck v. City of Camden, 25 N.J. 450, 466 (1957); Coll v. Sherry, 29 N.J. 166, 172 (1959). As was said in Fisch v. Manger, 24 N.J. 66, 80 (1957):
"Notwithstanding earlier doubts * * * there is now no question as to the power of our appellate courts to reverse a trial court's refusal to grant a new trial * * * where it is satisfied that there has been `an abuse of discretion' * * * or, in the more modern terminology, `a manifest denial of justice.'"
See also Annichiarico v. Mobilite, Inc., 19 N.J. Super. 492, 497 (App. Div. 1952). Appellate disturbance of the trial result is not only permissible but required where the verdict *518 "constitutes a palpable perversion of the jury function." Hager v. Weber, supra, 7 N.J., at page 210.
In passing upon the defendant's motion for a new trial, the trial judge expressly stated that the verdict was "liberal" and that if he had tried the case without a jury, he would not have rendered a verdict of $20,000. He said he did not "know upon what they based their verdict" but that he had a right to assume that it was based upon the testimony. Beyond a mere reference to the right of the jury to find the plaintiff and her doctors credible, the trial judge's opinion does not state in affirmative language his conviction that such testimony was credible and that it established a basis for the damages awarded. While the trial judge could not substitute his judgment for that of the jury on debatable questions, it is not sufficient, in a case where the judge has indicated he would not have rendered a like verdict, to rest a denial of the motion on the mere assumption that the jury properly performed its function.
Giving full credence to plaintiff and her witnesses and due regard to the conclusions of the trial judge, our judgment is that there was still no evidence to warrant a verdict of $20,000. All of the medical testimony was to the effect that the subluxation plaintiff suffered was very mild, and one physician described is as "microscopic." Dr. Milnamow's estimated 15% restriction of her overall activity was not confined to any physical impairment but rested primarily on what he said was plaintiff's "very great psychic overlay"  a matter entirely subjective, as were many of her complaints  and Dr. DePalma found that plaintiff was suffering from "an exaggerated emotion, response to these things." The court did not permit the jury to consider any claimed lost profits, so that this element was out of the case. That aside, plaintiff's asserted deterioration of her business related to her disability was exhibited only by a reduction in net profits of $305.75. Out-of-pocket losses were but $508. The conclusion is irresistible that, in view of the defendant's youth and apparently haphazard driving and the fact that plaintiff *519 wore her collar during the trial, the jurors were prejudiced in her favor and that they awarded a grossly excessive verdict as a result.
Although it is unnecessary to consider defendant's alternative point that the court erred in permitting Dr. Milnamow to interpret X-ray plates notwithstanding his denial of expertise in the field, we find no abuse of discretion in this respect; the physician stated his general medical education included training in the reading of X-rays. In any event, his reading was corroborated by the testimony of Dr. DePalma, and any error in this connection could not have been prejudicial. See Young v. Stevens, 132 N.J.L. 124, 126 (E. & A. 1944). Cf. Carbone v. Warburton, 11 N.J. 418, 425 (1953).
Reversed and remanded for a new trial as to damages.